912 A.2d 770 (2006)
BROOKHAVEN BAPTIST CHURCH, Appellant
v.
WORKERS' COMPENSATION APPEAL BOARD (HALVORSON), Appellees.
Supreme Court of Pennsylvania.
Submitted July 26, 2005.
Decided December 27, 2006.
*772 Denis Matthew Dunn, Media, for Brookhaven Baptist Church, appellant.
Amber Marie Kenger, Richard C. Lengler, Harrisburg, for W.C.A.B., appellee.
Arthur G. Girton, Chester, for Edwin Halvorson, appellee.
BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER AND BALDWIN, JJ.

OPINION
Justice NEWMAN.
We are called upon to determine whether Edwin Halvorson (Decedent) was an employee of the Brookhaven Baptist Church (the Church) for purposes of the Fatal Claim Petition filed by Thelma Halvorson (Mrs. Halvorson) pursuant to the Workers' Compensation Act (Act).[1] The Commonwealth Court determined that he was an employee of the church and we now reverse.

FACTS and PROCEDURAL HISTORY
Mrs. Halvorson and Decedent were married in 1938 and began attending the Church in early 1989. The Church had a small congregation at the time, only registering twenty-five members. Because contributions were meager, Church members performed the majority of the necessary Church maintenance. In fact, the Church Constitution designated the Board of Trustees as the persons responsible for: "Maintenance and Protection of Church Building, Grounds, Furnishings and Equipment; Operational Supervision; Building Improvements; [and] Plans for Future Building Needs of the Church." Constitution of the Brookhaven Baptist Church 8 (effective May 8, 1963, as amended December 1, 1975). These duties were carried out on a voluntary basis. The single exception to the obligations of the Board of Trustees was that the Church paid to have the grass cut on the approximately 1.5-acre Church property. For some years prior to 1989, the Church employed John Coppock (Mr. Coppock), a local student, to cut the grass. The Trustees completed all other grounds maintenance, such as edging the gardens, planting flowers, and pruning the shrubs and trees.
*773 Beginning in the Spring of 1989, following Mr. Coppock's departure for school, Decedent agreed to cut the grass for twenty-five dollars per week.[2] The Church supplied the tractor-mower and the gasoline to operate it. Decedent determined whether the grass needed to be cut and when he would cut the grass. His usual custom, according to Mrs. Halvorson, was to mow half of the grassy area on one day and the remaining half on another day.
The Halvorsons became members of the Church in October of 1989. Decedent was appointed a Church Trustee in January of 1990. As a Trustee, Decedent performed various maintenance duties for the Church such as painting the men's bathroom, changing light bulbs, vacuuming rugs, washing windows, cleaning restrooms, and other chores. He also continued to run the Church tractor to cut the grass for twenty-five dollars per week. Decedent and the other Trustees routinely came to the Church on Friday mornings throughout the year to fulfill their Church maintenance obligations.
On June 7, 1991, a Friday, Decedent left home around 8:30 A.M. telling Mrs. Halvorson that he would be back later to take her shopping and that he was going to the Church to cut the grass. Unbeknownst to her, he also took his hedge cutting shears with him. Pearl Moore, a neighboring property owner, walked her new dog that morning and saw Decedent in the parking lot of the Church. When Mr. Geiger arrived at the Church at approximately 8:45 A.M., Decedent was trimming the bushes beneath one of the Church windows. Mr. Geiger yelled a greeting and waived at Decedent, who hollered and waived back. Mr. Geiger went into the Church, checked the basement windows for break-ins, and got out the vacuum cleaner, preparing to vacuum the Church hallway. He heard a loud noise, saw a cloud of black smoke, and observed Decedent emerge from the black smoke engulfed in flames. Apparently, Decedent had gathered up the shrub clippings, piled them on the grass in the far corner of the Church driveway, and set fire to them using a can of gasoline. The fire department and an ambulance were called, with the fire chief, Gary Thompson (Thompson) arriving only moments later. Decedent was conscious and said to Thompson, "I think I screwed up" and "is my face burn[ed]?" (Thompson Deposition, October 17, 1996, p. 5.) Decedent died on July 1, 1991, nearly a month after suffering severe burns.
Mrs. Halvorson filed a Fatal Claim Petition on March 5, 1992, alleging that her husband died as a result of the work-related injuries he sustained while within the scope of his employment with the Church. She also filed a third-party legal action against the Church. On April 4, 1993, the workers' compensation matter was placed on an indefinite postponement pending the outcome of the common pleas court action.[3] The workers' compensation action was reactivated on July 27, 1995, and hearings were held before the WCJ on April 18, 1996, and November 7, 1996.
*774 After some procedural irregularities,[4] the WCJ[5] held two more hearings and issued her decision on June 7, 2001. The WCJ generally found all witnesses credible and that: (1) Decedent was employed to cut the grass; (2) the Church provided all of the materials and equipment necessary to carry out the task; and (3) trimming the bushes was "incidental and necessary for Decedent to perform in order to accomplish his task of grass cutting." (Decision of WCJ Sarah Makin dated June 7, 2001, p. 2.) The Church appealed to the Board.
The Board rendered a decision on December 16, 2003, affirming the Order of the WCJ. The Board observed that cutting the grass did not require special skills and that the Church supplied all the tools, equipment, and gasoline required to perform the task. Further, the Board found it significant that Decedent was compensated on a weekly basis for cutting the grass, also relying on the conclusion of the WCJ that trimming the bushes was an essential adjunct to Decedent's primary task. The Church appealed this decision to the Commonwealth Court.
In a Memorandum Opinion issued on October 20, 2004, the Commonwealth Court affirmed. Brookhaven Baptist Church v. Workers' Comp. Appeal Bd. (Halvorson), No. 2785 CD 2003 (Pa. Cmwlth. filed October 20, 2004). The Church raised four issues before the court essentially challenging the absence of medical evidence linking Decedent's death to the fire injuries, asserting in the alternative that Decedent was either a volunteer or an independent contractor, and arguing that the twenty-five dollars paid to Decedent was an honorarium rather than compensation.
The court concluded that Mrs. Halvorson carried her burden of establishing that the fire caused the death of her husband, despite the absence of expert medical testimony, because there was an obvious causal connection between the third-degree burns sustained by Decedent and his death. The court noted that Decedent had emerged from the black smoke "fully engulfed in flames" and suffered third-degree burns over sixty-seven percent of his body. Id. at 5.
The court additionally determined that Decedent was an employee of the Church because he received "valuable consideration" for his services. Id. at 10. It analogized this case to the decision of the Superior Court in Schreckengost v. Gospel Tabernacle, 188 Pa.Super. 652, 149 A.2d 542 (1959) (en banc), where the victim fell from the roof of the church he attended while it was under construction. The victim had volunteered to help with the construction of the church and, in exchange, the value of his labor was to be applied toward the payment of his tithes. The Superior Court found that the victim was an employee and had received valuable consideration.
The Commonwealth Court determined that Decedent was not a volunteer on the *775 basis that he received valuable consideration for cutting the grass. It found no error in the determination of the WCJ that trimming the bushes on the Church property was essential to the completion of his primary task. Relying on the decision of the Iowa Supreme Court in Gardner v. Trustees of Main Street Methodist Episcopal Church, 217 Iowa 1390, 250 N.W. 740 (Iowa 1933), the court concluded that cutting the grass was within the purview of "church business."
Finally, the court concluded that Decedent was not an independent contractor because the Church furnished the tools. The court observed that, although the Church exerted little direct supervision over Decedent when he was cutting the grass, this was due to the lack of special expertise necessary to complete the job.
Judge Leavitt filed a Dissenting Opinion. It was her belief that Decedent was a volunteer or possibly an independent contractor, but definitely not an employee. She noted that the Church exercised little, if any, control over the grass-cutting activities where Decedent alone decided when and how to cut the grass. She characterized the payments to Decedent for his grass-cutting services as simply a reflection of the unique relationship that existed between the Church and its congregants. She analogized Decedent's services with those of the foster grandparents in Wolf v. Workers' Compensation Appeal Board (County of Berks), 705 A.2d 483 (Pa. Cmwlth.1997), where the Commonwealth Court concluded that providing foster grandparents with transportation, meals, and a stipend of $2.35 per hour did not transform them from volunteers to employees.
We granted allowance of appeal to determine whether an employer-employee relationship existed and to examine Mrs. Halvorson's entitlement pursuant to the Act.

DISCUSSION
The Church contends that Decedent was a "volunteer" and that the money that he received for cutting the grass was a "nominal honorarium." The Church argues that Decedent was not cutting the grass when he sustained the fatal injury, but was performing volunteer services for the Church by trimming the bushes. Thus, the Church complains, Decedent's efforts to trim the bushes, which led to his injury, were uncompensated trustee duties. However, at the hearing, Mr. Geiger, another member of the Board of Trustees, testified that Decedent was employed by the Church to cut the grass once per week for which he was paid twenty-five dollars, and that the equipment used for this purpose was owned by the Church. Various other witnesses testified to the fact that Decedent had been hired to cut the grass, and that the Church had paid Mr. Coppock, the previous grass cutter, the same amount.
We begin our analysis with the language of the Act. The Act is paternal legislation and, pursuant to its title, is one "defining the liability of an employer to pay damages for injuries received by an employe in the course of employment." Section 1 of the Act, 77 P.S. § 1 (Historical and Statutory Notes, Title of Act). In discussing the principles of the Act, this Court has stated:
[O]ne who enlists in the army of industrial and business workers must, in order to entitle himself to the benefits of the act, undertake more than a mere casual or incidental job; he must enter the ranks of those employed in the regular course of the business of his particular employer, and when such a worker claims compensation, it must appear *776 that he was injured in the course of his employment.
Callihan v. Montgomery, 272 Pa. 56, 115 A. 889, 890 (1922). Hence, we must first ascertain whether the Church was an employer under the Act.
The definition of "employer" as used in the Act is "synonymous with master, and to include natural persons, partnerships, joint-stock companies, corporations for profit, corporations not for profit, municipal corporations, the Commonwealth, and all governmental agencies created by it." 77 P.S. § 21. It cannot be gainsaid that the Church, which is a corporation, is an employer pursuant to the Act.
It is the definition of "employee" that has evoked contention and disagreement here. The Act defines an "employe" as including "[a]ll natural persons who perform services for another for a valuable consideration, exclusive of persons whose employment is casual in character and not in the regular course of the business of the employer. . . ." 77 P.S. § 22. Three specific elements of this definition are key to the present analysis and must be addressed in order to support a finding that Decedent was an employee of the Church. These elements are: (1) the presence of valuable consideration; (2) whether the employment was casual in character; and (3) whether the employment was in the regular course of employer's business. Given the undisputed fact that Decedent was a natural person who was performing services for the Church, the first critical element is a determination that Decedent was performing services for "valuable consideration."

Valuable Consideration
Decedent appears to have performed numerous services for the Church, among them were painting, interior maintenance, exterior maintenance, and grass cutting. Although Mrs. Halvorson asserts that Decedent was not compensated in this life for the majority of the tasks he performed, the witnesses generally agreed that Decedent was being paid by either an honorarium or an actual fee to cut the grass. Ordinarily, if services are performed for the payor directly, the presumption is that the amount received is for the service and it is not a gift or honorarium. The fact that the parties may have called the payment an honorarium is important, but not conclusive, for in light of all the circumstances, the term is often loosely or inaccurately used. See, e.g., Bogardus v. Comm'r of Internal Revenue, 302 U.S. 34, 43, 58 S.Ct. 61, 82 L.Ed. 32 (1937); State ex rel. Rollins v. Indus. Comm'n, 105 Ohio St.3d 319, 825 N.E.2d 1104 (2005).
In this case, Dorothy Wood, the Church Treasurer, testified that Decedent was paid twenty-five dollars per week "[b]ecause that's what he agreed to cut it for." (Thompson, Haines, D. Wood, R. Wood Deposition dated October 17, 1996, p. 26.) This negotiation for payment indicates that the weekly payment amount was not truly in the form of an honorarium but in the form of wages. An honorarium, in common understanding, means a voluntary reward for a service for which no remuneration could be collected by law. Thus, an honorarium is given to one who performed services for little or nothing and its tender is decided by the one for whom the services were performed without an obligation to give it. See, e.g., Bogardus. Here, the amount to be paid was clearly the subject of some discussion between the Church and Decedent. The fact that Decedent received twenty-five dollars every week for cutting the grass, even though the checks were issued approximately every four weeks, clearly constitutes wages as well as valuable consideration. The Church supplied *777 the mower and the gasoline so that Decedent had little in the way of expenses to diminish the consideration he was receiving. Cf. Wolf v. Workers' Comp. Appeal Bd. (County of Berks), 705 A.2d 483, 485 (Pa.Cmwlth.1997) (finding that nominal gratuity afforded to low-income foster grandparents was meant to offset their expenses "so as to unburden low-income persons").
We turn to the final two critical elements in determining whether a person is an employee within the purview of the Act. The Act exempts those employees whose employment is both "casual in character and not in the regular course of the business of the employer." 77 P.S. § 22. Whether the employment is "casual" in character and not in the regular course of the business of the employer is a question of law and our review is plenary. Callihan v. Montgomery, 272 Pa. 56, 115 A. 889, 891 (1922).

Employment Casual in Character
Courts have struggled to define employment that is "casual in character." Our Superior Court developed the following definition, stating that "[a]n employment is casual in character where it is occasional, irregular, or incidental as distinguished from regular and continuous." Williams v. Baptist Church, 123 Pa.Super. 136, 186 A. 168, 170 (1936) (en banc). There Williams, a church trustee, was employed by his church as a carpenter at forty cents per hour in his spare time and was enclosing a porch on one of the income properties that the church owned. While descending a ladder, Williams fell and sustained serious injuries to his head and spine. The Superior Court concluded that Williams was not eligible for workers' compensation benefits because his employment was casual and not in the regular course of the business of the church. The court observed that Williams was hired only sporadically whenever projects required his special abilities. It found it significant that Williams was working on income property owned by the church that was not directly associated with the work of the church.
Similarly, in Marsh v. Groner, 258 Pa. 473, 102 A. 127 (1917), Mrs. Groner hired Marsh to do some plastering in her house as she was enlarging and remodeling it. Marsh fell off some scaffolding and was injured. Although Mrs. Groner was paying Marsh and he was in her employ at the time of his injury, this Court concluded that Marsh's employment was casual in nature and declined to award benefits. But in Tarr v. Hecla Coal & Coke Co., 265 Pa. 519, 109 A. 224 (1920), a neighboring mine lent some of its workers to the Hecla Coal & Coke Co. (Hecla), whose coal mine was on fire. Tarr was experienced in fighting mine fires and volunteered to go. He was killed while fighting the fire and the court found that Tarr was an employee of Hecla, even though his employment was of brief duration. Tarr was engaged in the business of Hecla and was being paid for his services as its employee. As such, this Court affirmed the payment of workers' compensation benefits.
In Blake v. Wilson, 268 Pa. 469, 112 A. 126 (1920), a farm owner employed a teacher to finish a silo, which was begun some time previously, during the teacher's summer vacation. The teacher fell and died while roofing the silo. This Court noted the difficulty in circumscribing the parameters of "casual" employment, but defined it as work that "comes about by chance, fortuitously, and for no fixed duration of time." Id. at 129. In Blake, we stated that the concurrence of two fortuitous events (the expiration of the school term and the convenience of the employer) gave rise to the employment so that it was *778 casual in nature. In Callihan, the Court, surveying cases from Illinois, California, Minnesota, Massachusetts, and Maryland, concluded that an oil well operator's employment of a skilled mechanic to repair an engine was "casual" and not in the "regular course" of the business of the employer. The Court found it helpful to define "casual" using its antonyms, namely `regular,' `systematic,' `periodic,' and `certain.' Callihan, 115 A. at 893.
In the instant matter, Decedent was employed on a regular basis to cut the grass once per week during the growing season. He negotiated the wage and utilized the materials and equipment supplied by his employer, the Church. The employment was not irregular, sporadic, or incidental and was, therefore, not casual in nature. Decedent is more properly a seasonal employee rather than a casual employee. Further, Decedent had been employed by the Church for nearly three years to perform the same task, the same way, and during the same time period. Thus, we agree with the determination of the Commonwealth Court that Decedent was an employee of the Church for purposes of cutting the grass.[6]

Business of the Church
The final element in the determination as to whether Decedent was an employee for purposes of the Act was whether Decedent was engaged in the business of the Church. The Act exempts from coverage those persons who are casually employed and not engaged in the business of the employer. We acknowledge a certain degree of ambiguity in the phraseology employed by the General Assembly.[7] On one hand, the statutory section has been interpreted by this Court to mean that, to be exempt from coverage, a person must be both casually employed and not engaged in the business of the employer. Vescio v. Pa. Elec. Co., 336 Pa. 502, 9 A.2d 546 (1939); McCarthy v. Dunlevy-Franklin Co., 277 Pa. 467, 121 A. 409 (1923); Blake v. Wilson, 268 Pa. 469, 112 A. 126 (1920); Tarr v. Hecla Coal & Coke Co., 265 Pa. 519, 109 A. 224 (1920). On the other hand, we have interpreted the same statutory section to exempt persons who are casually employed as well as those who are not engaged in the business of the employer, meaning that either situation would exclude the employee from coverage. Cochrane v. William Penn Hotel, 339 Pa. 549, 16 A.2d 43 (1940); Marsh v. Groner, 258 Pa. 473, 102 A. 127 (1917). We need not resolve this conflict today for we have determined that Decedent was an employee rather than casual labor for purposes of cutting the grass. This would render the first interpretation inapplicable. If we determine that Decedent was employed in the business of the Church, then neither interpretation of this statutory section will apply and we will leave its resolution to another day.
While there may be a certain reluctance to characterize the activities of a church or temple in terms of the marketplace, the term business does not always connote a profit objective. The business of a religious institution is not strictly confined to charitable purposes, spiritual uplift, ministering to the needy, conducting religious services, and saving souls. Those courts that have considered what constitutes the business of the church, have concluded that, in order to attain the goals of the church or the temple, it is also necessary *779 to construct and maintain a house of worship in which the religious work is conducted. Schreckengost v. Gospel Tabernacle, 188 Pa.Super. 652, 149 A.2d 542, 544 (1959); Farnam v. Linden Hills Congregational Church, 276 Minn. 84, 149 N.W.2d 689, 696 (1967); Levecque v. Dupuis, 119 Conn. 224, 175 A. 782 (1934); Gardner v. Trustees of Main Street Methodist Episcopal Church, 217 Iowa 1390, 250 N.W. 740 (Iowa 1933); Greenway Baptist Church v. Indus. Comm'n, 130 Ariz. 482, 636 P.2d 1264, 1267 (Ct.App.1981), overruled on other grounds by, Young v. Envtl. Air Products, Inc., 136 Ariz. 158, 665 P.2d 40 (Ct.App.1983); accord Nathe v. Franciscan Sisters of the Immaculate Conception, 21 W.C.D. 267 (Minn. Ind. Comm'n 1959) (holding that care of the grounds was part of the business of the hospital). The maintenance and repair of church property and keeping the property in presentable condition is generally considered the usual course of business conducted on those premises by the trustees or other church management personnel. Therefore, we conclude that Decedent was employed in the business of the church when he was cutting the grass.
This does not end the matter, for Decedent was clearly not cutting the grass at the time of his injury. Although the testimony of the individuals on site that day unanimously agreed that the tractor was still in the shed at the time of the injury, the WCJ found that trimming the bushes was incidental to the task of cutting the grass. (WCJ Opinion dated June 7, 2001 at 2.) The Board affirmed this determination, also concluding that trimming the bushes was incidental to Decedent's employment. The Commonwealth Court agreed. However, the proper question is not whether trimming the bushes was incidental to the grass-cutting task, but whether that activity was part of the employment arrangement. We hold that, in this case it was not.
Decedent was intimately involved in the work of the Church. He wore several "hats" during the years of his Church membership for he was not only a member, he also served as a Trustee as well as a seasonal employee. The duties of a Trustee included building and grounds maintenance. Several witnesses testified as to the various activities of the Trustees in this regard, but they were unanimous in stating that the only paid position was for running the tractor to cut the grass. In fact, Mr. Geiger testified that he, not Decedent, usually completed the hand mowing in those areas that could not be reached with the tractor, and for which Mr. Geiger received no compensation. (Notes of Testimony dated April 18, 1996, p. 22.) We believe that the WCJ overlooked one important factor. This was the fact that no trimming of bushes and overhanging tree limbs, no edging, picking up sticks, hand mowing, or garden work, all of which are necessary to maintain the grounds of the Church, were ever included in the fee to cut the grass. (Thompson, Haines, D. Wood, R. Wood Deposition dated October 17, 1996, testimony of R. Wood, p. 51.) As Mr. Geiger testified, the Church paid an individual for running the tractor to cut the grass. When Mr. Coppock was paid to mow the grass, prior to the employment of Decedent, the Trustees were responsible for all other tasks included in grounds maintenance. Id. There is no testimony to indicate that the scope of Decedent's employment was increased over that of Mr. Coppock, especially as Decedent was paid the same amount for the same job. Accordingly, we must find that Decedent was acting as a Trustee on June 7, 1996, while trimming the bushes, rather than as an employee, and was not in the course of his employment when he was injured.
*780 Accordingly, the Order of the Commonwealth Court is reversed.
Chief Justice CAPPY, Justices BAER and BALDWIN join the opinion.
Justice EAKIN, files a concurring opinion in which Justices CASTILLE and SAYLOR join.
EAKIN, Justice concurring.
I agree with the majority that the Commonwealth Court's order should be reversed. I write separately because I conclude the decedent was not a Church employee, but an independent contractor.
While no hard and fast rule exists to determine whether a relationship is that of employer-employee or owner-independent contractor, the analysis is not different merely because the services are law-related. Our case law is replete with guidelines and factors that must be taken into consideration when making this determination:
Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of a regular business of the employer, and . . . the right to terminate the employment at any time.

Universal Am-Can, Ltd. and AIAC v. Workers' Compensation Appeal Board (Minteer), 563 Pa.480, 762 A.2d 328, 333 (2000) (internal citations omitted) (quoting Hammermill Paper Company v. Rust Engineering Company, 430 Pa. 365, 243 A.2d 389, 392 (1968)).
"Whether some or all of these factors exist in any given situation is not controlling." Id. (quoting J. Miller Co. v. Mixter, 2 Pa.Cmwlth. 229, 277 A.2d 867, 869 (1971)). While each factor is relevant, control over the work to be completed and the manner in which it is to be performed have become dominant considerations and are the primary factors in determining employee status. Id. (collecting cases). In an employer-employee relationship, the employer controls the result of the work and has the right to direct the way in which it shall be done, whereas in an owner-independent contractor relationship, the independent contractor has exclusive control over the manner of performing it, being responsible only for the result. Moon Area School District v. Garzony, 522 Pa. 178, 560 A.2d 1361, 1367 (1989) (quoting Feller v. New Amsterdam Casualty Co., 363 Pa. 483, 70 A.2d 299, 300 (1950)). Broadly stated, if an individual is under the control of an employer, the individual is an employee; if the individual is not under such control, he is an independent contractor. Id. (quoting Feller, at 300).
"[I]nspection of the progress of work does not require . . . an inference of exclusive control over the manner of performance of the work, but rather only of interest in the result." Cox v. Caeti, 444 Pa. 143, 279 A.2d 756, 758 (1971) (citing Murrin v. Rifugiato, 373 Pa. 561, 96 A.2d 865 (1953)). "Where control is not reserved over the means, the relationship is that of independent contractor, and conversely, where such control is reserved, the relationship is that of . . . employee." Commonwealth v. Continental Rubber Works, 347 Pa. 514, 32 A.2d 878, 880 (1943) (quoting Kelley v. Delaware, L. & W.R. Co., 270 Pa. 426, 113 A. 419, 420 (1921)).
In re Perrone, 587 Pa. 388, 899 A.2d 1108, 1118-19 (2006) (Eakin, J., dissenting) (footnote omitted).
*781 Here, the facts indicate the decedent was an independent contractor. As the majority states, he determined whether the grass needed to be cut and when he would cut it. Majority Op., at ___, 912 A.2d at 773. At deposition, a Church member was asked:
Did the [C]hurch have any control over when [decedent] cut the grass? A: No. He was more or less on his own, wanted, [sic] when he thought it needed to be done. . . . Q: Was [decedent] the one who determined when he was going to cut the grass? A: Yes. . . . Q: And how he was going to cut it.? A: Yes.
O.R., Deposition of Edward H. Geiger, 4/18/96, at 26-27. The decedent's wife was asked, "Who was it that determined whether or not the grass needed to be cut, if you know? A: Well, [decedent] took that on his own. If he thought it had to be cut, he would cut it." O.R., Deposition of Thelma Halvorson, 4/18/96, at 15-16. There is no evidence in the record the Church had the right to control his work.
As the majority also states, testimony varies concerning how the decedent was paid. Majority Op., at ___ n. 2, 912 A.2d at 773 n. 2. It is clear, however, the Church did not give him a W-2 Form, O.R., Halvorson Deposition at 16, and he was not paid a set amount at a set time as most employees are paid. And while the Church Constitution provides that employees beneath Pastor, Assistant Pastor, and Associate Pastor will receive and sign written agreements, O.R., Constitution of the Brookhaven Baptist Church, at 14, the decedent's work arrangement was based solely upon an oral agreement. O.R., Halvorson Deposition at 8-9. The only fact supporting a determination that the decedent was an "employee" is the Church provided the tractor and gasoline, matters not inconsistent with his independent contractor status.
Justices CASTILLE and SAYLOR join this concurring opinion.
NOTES
[1] Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§ 1-1041.4; 2501-2626.
[2] There are several different variations on the payment method expressed in the testimony of some of the witnesses. Mrs. Halvorson stated that her husband was paid one hundred dollars per month; Edward Geiger (Mr. Geiger), another Church trustee, testified that it was twenty-five dollars per cutting; Dorothy Wood, the Church treasurer, testified that it was twenty-five dollars per week. This small inconsistency does not affect our decision, and we will assume that payment was twenty-five dollars per week throughout the five-month, grass-growing season.
[3] There is no information in the record as to the disposition of the third-party action commenced in the court of common pleas.
[4] On November 19, 1997, the WCJ directed briefs to be submitted on a schedule of thirty days for Mrs. Halvorson and thirty days thereafter for the Church. Mrs. Halvorson did not submit her brief until September 2, 1998, and the WCJ issued his decision on September 10, 1998, without the benefit of a brief from the Church. Further, while the parties had agreed to bifurcate the issues of liability and compensation, the WCJ decided both issues. The Board vacated the decision of the WCJ and remanded so that the WCJ could consider all the evidence and hear from both parties before rendering a decision. Finally, the Board specified that the issue before the WCJ was limited to liability.
[5] Due to the death of WCJ Fred Troilo on January 6, 2000, three weeks prior to the Board's decision, the matter was reassigned to WCJ Sarah Makin.
[6] Because we conclude that Decedent was an employee of the Church we need not address the alternative contention of the Church that Decedent was an independent contractor.
[7] The parties neither raised nor briefed this issue.