NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3573
_____

NATIONWIDE MUTUAL INSURANCE COMPANY,

Appellant

v.

TIMOTHY SHAW, individually;
TIMOTHY SHAW, d/b/a Shaw Brothers Donkey Ball Co.;
ROBERT EISENBERRY
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(Civ. Action No. 3:10-cv-00374)
District Judge: Honorable James M. Munley
_____

Argued June 5, 2012
_____

Before: SCIRICA, GREENAWAY, JR., and COWEN, *Circuit Judges.*

(Opinion Filed:  August 6, 2012)

Krista M. Kochosky, Esq. (argued)
O'Malley & Magley
5280 Steubenville Pike
Pittsburgh, PA 15205

Charles E. Haddick, Jr., Esq.
Dickie, McCarney & Chilcote
425 North 21st Street
Plaza 21, Suite 302
Camp Hill, PA 17011
    *Counsel for Appellant Nationwide Mutual Insurance Company*

Michael R. Goffer, Esq. (argued)
Law Offices of Goffer & Cimini
1603 Monsey Avenue
Scranton, PA 18508
    *Counsel for Appellees Timothy Shaw, Timothy Shaw d/b/a Shaw Brothers Donkey Ball Co., and Robert Eisenberry*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

Appellant Nationwide Mutual Insurance Company ("Nationwide") appeals the District Court's Order denying its motion for summary judgment and granting summary judgment in favor of Appellees Timothy Shaw ("Shaw"), individually and d/b/a Shaw Brothers Donkey Ball Co., and Robert Eisenberry ("Eisenberry"). For the reasons that follow, we will vacate the District Court's Order and remand for further proceedings.

## I.    BACKGROUND

Because we write primarily for the benefit of the parties, we recount only the essential facts.

Shaw was the sole proprietor of a business that provided donkeys for charity basketball events.[1]  The donkeys were housed and cared for in a New York barn that Shaw leased in the name of his business.  For several decades, the business operated under the name "Shaw Brothers Donkey Ball Company."  Around 2003, on the advice of his attorney, Shaw changed the name of the business to "Shaw Brothers Donkey Ball, LLC."

Shaw had a commercial general liability policy for the business with Nationwide (the "Insurance Policy"), providing coverage for claims of bodily injury or property damage, among other areas of coverage.  The Insurance Policy contained a number of exclusions to coverage.  The relevant exclusion provision at issue here stated:

> 2.  Exclusions
>
> This insurance does not apply to:
>
> e.  Employer's Liability
>
> "Bodily injury" to:
>
> (1) An "employee" of the insured arising out of and in the course of:
>
> (a) Employment by the insured; or
>
> (b) Performing duties related to the conduct of the insured's business

(App. 160.)  In other words, Nationwide expressly removed from coverage a bodily injury to one of Shaw's "employees."

---

[1] Shaw's family started the business, which Shaw assumed sole control of in approximately 2001.  Shaw earned money from admission fees charged to those attending the fundraising events.  He closed the business around August 2009.

The Insurance Policy, however, did not define who constitutes an employee of the business. Instead, the Insurance Policy merely stated that an "employee" *includes* a "leased worker" but *does not include* a "temporary worker." (App. 170.) Those two terms are defined in the Insurance Policy:

> 10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

> 19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

(App. 170, 172.) Separately, the Insurance Policy defined a "volunteer worker" as a "person who is not your 'employee,' and who donates his or her work and acts at the discretion of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you." (App. 172.)

Eisenberry was a retired farmer who had known Shaw for approximately ten to twelve years at the time of the accident that precipitated this litigation, though the two were not "close family friend[s]." (App. 17.) Eisenberry was introduced to Shaw through Mr. Parks, who baled hay for Shaw. Mr. Parks informed Shaw that Eisenberry could help him (Shaw) whenever needed. At some point thereafter, Eisenberry began working at the New York barn that housed Shaw's donkeys. Eisenberry's responsibilities included unloading and moving hay, cleaning the donkey stalls, and feeding and watering the donkeys.

4

On September 4, 2007, Eisenberry was in possession of Shaw's truck. At some point, Eisenberry arrived at the farm and began helping Shaw and another man unload bales of hay from a wagon. Eisenberry was stacking bales of hay on the second floor of the barn when he fell through the floor due to missing planks that were covered by pieces of hay. Eisenberry was rendered a paraplegic as a result of the fall.

Eisenberry sued Shaw in the U.S. District Court for the Middle District of Pennsylvania, asserting premises liability. On February 9, 2010, a jury returned a verdict in Eisenberry's favor.[2] On February 19, 2010, Nationwide filed a declaratory judgment action in the District Court against Shaw, the Donkey Ball business, and Eisenberry. Nationwide asserted that it was not liable under the Insurance Policy to provide coverage to Shaw for the accident. Both sides moved for summary judgment. On August 22, 2011, the District Court denied Nationwide's motion for summary judgment and granted summary judgment in favor of Shaw, the Donkey Ball business, and Eisenberry. Nationwide filed a timely appeal.

## II.     JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

Because the District Court's jurisdiction was premised on diversity, we, like the District Court, "must apply state substantive law and federal procedural law." *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262 (3d Cir. 2011) (citation omitted). We

---

[2] At oral argument, counsel for Nationwide informed this Court that Eisenberry and Nationwide stipulated to an award of $1 million in damages.

5

exercise plenary review over the District Court's grant of summary judgment. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 174 (3d Cir. 2011) (citation omitted).

## III.    <u>ANALYSIS</u>[3]

The central issue in the declaratory judgment action is whether Eisenberry was Shaw's "employee" at the time of the accident, as that term is contemplated in the Insurance Policy. If Eisenberry assumed employee status, the employee exclusion provision in the Insurance Policy would apply, and Shaw would be unable to seek coverage for the accident. On the other hand, if Eisenberry was not Shaw's employee, then Nationwide concedes it must provide Shaw with coverage for the accident.

### A.    **Insurance Policy's Definition of "Employee"**

We begin with the terms of the Insurance Policy itself. The parties acknowledge, and the District Court agreed, that the Insurance Policy fails to provide a complete and sufficient definition of "employee." We agree.

The Insurance Policy states that an employee includes a leased worker but does not include a temporary worker. Eisenberry was neither. To be a leased worker, Eisenberry would have had to be furnished to Shaw under a labor leasing agreement. To be a temporary worker, Eisenberry would have had to be replacing a permanent employee or meeting Shaw's short-term needs. Neither situation is factually true here.

Separately, the Insurance Policy provides that an individual who donates his time and is not paid a fee or other compensation—what the Insurance Policy classifies as a

---

[3] Nationwide raised several points of error in its briefing. At oral argument, counsel for Nationwide conceded each issue, except the District Court's application of the employee liability exclusion provision. Accordingly, we will address only this issue.

6

"volunteer worker"—is not an employee. The record reveals that Eisenberry was paid for his services in a variety of forms, even though this compensation was not calculated based on time worked. First, Shaw permitted Eisenberry to take hay from the barn to feed his (Eisenberry's) animals. Eisenberry stated that this amounted to approximately ten to fifteen bales of hay per month, at roughly eighty cents per bale. Second, Eisenberry was permitted to use Shaw's truck. Third, on occasion, Shaw gave Eisenberry about $5 or $10 for gas money. While this multifaceted form of payment was surely modest, it still constitutes sufficient compensation to remove Eisenberry from volunteer worker status.

Because the Insurance Policy does not resolve whether Eisenberry was Shaw's employee, the parties agreed in the District Court to have the term "employee," as used in the Insurance Policy, be synonymous with the definition of the term provided in Pennsylvania's Workers' Compensation Act ("WCA"). We turn now to the WCA.[4]

**B.     Pennsylvania's Workers' Compensation Act**

The WCA defines an "employe"[5] as "[a]ll natural persons who perform services for another for a valuable consideration, exclusive of persons whose employment is casual in character and not in the regular course of the business of the employer . . . ." 77

---

[4] We note that our analysis under the WCA is not intended to be the archetype for adjudicating whether an employer-employee relationship existed. Our ruling should not supplant a necessary inquiry into Pennsylvania common law. We consult the WCA because the parties expressly agreed that the term "employee," as used in the Insurance Policy, would be elucidated by the definition of that term in the WCA. Nevertheless, we adhere to the position that the determination of employee status is determined by Pennsylvania common law.

[5] This is the spelling of the term in the statutory text.

7

Pa. Cons. Stat. § 22. *Brookhaven Baptist Church v. Workers' Comp. Appeal Bd. (Halvorson)*, 912 A.2d 770 (Pa. 2006) is the most recent case in this area. In *Brookhaven*, the Supreme Court of Pennsylvania iterated that there are three elements to this definition: "(1) the presence of valuable consideration; (2) whether the employment was casual in character; and (3) whether the employment was in the regular course of employer's business."[6] *Id.* at 776.

Before we proceed to analyze these three elements, we address the interplay between them. As to the first element, the WCA provides that an employee is one who receives valuable consideration for his services. Absent the exchange of valuable consideration, Eisenberry could not be Shaw's employee. The inquiry would end at this step.

As the District Court noted, the statutory language regarding the second and third elements has engendered some debate in Pennsylvania courts. While the second and third elements are joined by the connector "and" in the statutory text, suggesting by its plain terms that the presence of both elements is necessary to find that an individual is not an employee under the WCA, the *Brookhaven* court found "a certain degree of ambiguity" in the statute. *Id.* at 778. The *Brookhaven* court noted that it has, in prior cases, found the second and third elements to be both conjunctive and disjunctive. *Id.* That is, the statute has been interpreted to exempt from coverage "a person . . . both casually employed *and* not engaged in the business of the employer" as well as a person

---

[6] As in *Brookhaven*, the parties here do not dispute that Eisenberry was a "natural person" under the WCA.

who satisfies either of these two criteria. *Id.* The *Brookhaven* court cited cases purportedly supporting both interpretations of the statute, though the *Brookhaven* court did not seek to resolve the ambiguity. *Id.*

This ambiguity is at the forefront of this case. Faced with an unresolved issue of state law, the District Court applied the disjunctive approach. The District Court reasoned, without providing any support for its preference, that it "was persuaded by the reasoning of those decision [sic] that conclude a worker is exempt from coverage—and in that sense not an employee—if that worker is either employed casually or not engaged in the business of the employer." *Nationwide Mut. Ins. Co. v. Shaw*, No. 3:10-cv-374, 2011 WL 3667565, at *9 (M.D. Pa. Aug. 22, 2011).

Nationwide asserts that the District Court erred in choosing to apply a disjunctive standard. Specifically, Nationwide argues that, contrary to the declaration of ambiguity by Pennsylvania's highest court, we should part ways with the state supreme court and conclude that the WCA plainly imposes a conjunctive standard through the use of the connector "and" in the statutory text. As for the cases cited by the *Brookhaven* court purportedly advocating the disjunctive approach, Nationwide avers that those cases are actually consistent with the conjunctive approach. On the other hand, Shaw and Eisenberry contend that the District Court correctly determined that Pennsylvania law is ambiguous on this issue and, as a result, the District Court was justified in applying the disjunctive approach.

We agree with Nationwide that the District Court erred by not applying a conjunctive standard, but we cannot disregard *Brookhaven* as Nationwide suggests.

9

Because jurisdiction in this case was founded on diversity, we must follow any applicable authoritative rulings from the state supreme court. *See Mitchell Partners, L.P. v. Irex Corp.*, 656 F.3d 201, 203 (3d Cir. 2011) (stating that a "federal court must apply the law declared by the supreme court of the relevant state"). The *Brookhaven* court determined that the WCA was ambiguous to some degree, and we are not permitted to ignore this determination.

Although the *Brookhaven* court found there to be an ambiguity as to whether a conjunctive or disjunctive standard was warranted, the court declined to resolve the dispute. Where an issue has not been addressed by the state's highest court, "we must predict how the state's highest court would resolve the issue." *Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of Phila.*, 625 F.3d 148, 154 (3d Cir. 2010) (internal quotation marks and citation omitted). The *Brookhaven* court's decision not to resolve the ambiguity present in the definition of "employee" requires this Court to predict how the Supreme Court of Pennsylvania would resolve it.

Upon reviewing Pennsylvania precedent and the text of the WCA, we conclude that the Supreme Court of Pennsylvania would find that the statutory text "exclusive of persons whose employment is casual in character and not in the regular course of the business of the employer" imposes a conjunctive standard. 77 Pa. Cons. Stat. § 22. The WCA links two elements—whether the employment was casual and whether the work performed was part and parcel of the business—with the connector "and." Based on general principles of statutory interpretation, the connector "and" in a statute signifies a conjunctive standard. *See Rivera v. Phila. Theological Seminary of St. Charles*

10

*Borromeo, Inc.*, 507 A.2d 1, 8 (Pa. 1986).[7] The *Brookhaven* court cited two state supreme court cases purportedly following a different canon of statutory interpretation, treating the connector "and" as an "or," and requiring only one of these two elements for the employee exemption to apply.

But a closer inspection of these cases reveals that they are not inconsistent with a conjunctive approach. In *Cochrane v. William Penn Hotel*, the court agreed with a lower court that a maintenance worker at a hotel, who died while on the job, was an employee under the WCA. 16 A.2d 43, 44 (Pa. 1940). The court found that because the maintenance worker was not employed casually, it did not need to consider the propriety of the lower court's additional finding that the worker was not engaged in the business of the hotel. *Id.* Applying a conjunctive standard, the employee would need to be both employed casually *and* not working in the regular course of his employer's business to be exempt from the definition of employee. That the state supreme court ruled that the worker was not employed casually was sufficient by itself to support a finding that the decedent was an employee. *Id.*

The other case cited by the *Brookhaven* court—*Marsh v. Groner*, 102 A. 127 (Pa. 1917)—is admittedly less clear on this point. In *Marsh*, a handyman was injured while remodeling a woman's home; he argued that the woman owed him workers' compensation for his injury. *Id.* at 128. The court focused its inquiry on whether the handyman was engaged in the woman's business, reasoning that the woman's decision to

---

[7] Analyzing federal law, we have similarly determined that the word "and" imposes a conjunctive standard. *See Reese Bros., Inc. v. United States*, 447 F.3d 229, 235-36 (3d Cir. 2006).

11

remodel her home did not rise to the level of a business for which the handyman could be engaged. *Id.* at 128-29. As a result, the court affirmed a lower court ruling that denied the handyman workers' compensation. *Id.* at 129.

The approach taken in *Marsh* is somewhat muddled. On the one hand, the court concluded that the handyman's work was not within the regular course of any business and, therefore, affirmed a finding that the statutory exemption applied. This logic appears to countenance a disjunctive approach, as the court did not expressly conclude that it also must find the handyman's work to be casual to apply the exemption. However, the court also noted in its concluding sentences that the handyman's employment "was casual in character." *Id.* When read in tandem with the court's finding that the employment was not in the regular course of business, this would imply that a conjunctive approach was considered.

We cannot discern which approach curried the favor of the *Marsh* court, but we need not resolve that issue in this case. Even assuming the *Marsh* court applied a disjunctive standard, countless decisions since *Marsh* have unequivocally stated that the WCA imposes a conjunctive standard. *See, e.g.*, *McCabe v. Timothy Shanahan & Son*, 24 A.2d 16, 18 (Pa. Super. Ct. 1942) ("In order that the employer be relieved from liability both elements must be established, i.e., the employment must be (1) casual and (2) not in the regular course of the business of the employer."); *Diviney v. J. H. France Fire Brick Co.*, 13 A.2d 109, 110 (Pa. Super. Ct. 1940) ("It is clear from the plain language of this provision, that in order to exclude an employe[e] under this exception, it

12

must appear that his employment was not only occasional and incidental, but also outside of the regular course of the business of the employer.").[8]

Accordingly, we conclude the Supreme Court of Pennsylvania, were it faced with this issue, would determine that the WCA imposes a conjunctive standard. As a result, under the WCA, an individual who receives valuable consideration is exempt from employee status only if that individual was both employed casually and not performing work in the regular course of the employer's business. It was error for the District Court to apply a disjunctive standard to the statutory language "exclusive of persons whose employment is casual in character and not in the regular course of the business of the employer." 77 Pa. Cons. Stat. § 22. Having discussed the interplay between the three elements present in the WCA's definition of employee, we now proceed to address the District Court's findings regarding each of these elements. Because we will remand for fact finding on each element, we direct the District Court to apply a conjunctive approach to subsequent WCA analysis regarding the second and third elements.

### 1. Element 1: Valuable Consideration

An individual can be considered an employee, pursuant to the WCA, only if he received valuable consideration. Eisenberry was responsible for caring and maintaining the donkeys used in Shaw's business, for which he received some compensation. The issue is whether that compensation constituted valuable consideration.

---

[8] It also is noteworthy that *Marsh* predates each case cited by the *Brookhaven* court in support of the conjunctive interpretation, including *Cochrane*, which, as we have determined, is entirely consistent with a conjunctive reading.

13

Under Pennsylvania law, there is a presumption that "if services are performed for the payor directly, . . . the amount received is for the service and it is not a gift or honorarium." *Brookhaven*, 912 A.2d at 776. An honorarium, by contrast, "is given to one who performed services for little or nothing and its tender is decided by the one for whom the services were performed without an obligation to give it." *Id.* The District Court did not address the valuable consideration prong specifically, but the District Court did make factual findings germane to determining whether valuable consideration was exchanged.

In concluding that Eisenberry was not a "volunteer worker" under the Insurance Policy, the District Court reasoned that "[a]ll parties agree that Eisenberry received hay and cash in exchange for feeding donkeys and cleaning the barn. He therefore received a salary or other compensation for his services . . . ." *Shaw*, 2011 WL 3667565, at *8. This determination would appear to support a finding that Eisenberry received valuable consideration for his services. Elsewhere in its opinion, however, the District Court referred to Eisenberry's compensation as "occasional" and "supplemental and incidental to his larger purpose for [sic] spending his time on Shaw's farm." *Id.* at *10. This finding paints a somewhat different picture of the compensation, more akin to an honorarium. The compensation itself amounted to the equivalent of, at most, $144 per year in hay (fifteen bales per month at eighty cents per bale), $5 or $10 in gas money on occasion, and the use of Shaw's truck.

Given the inherent tension between the District Court's assessments of Eisenberry's compensation and the omission of any analysis on the valuable

14

consideration element, we cannot ascertain, on this record, whether Eisenberry received valuable consideration for his services. We will remand to the District Court to resolve this genuine dispute of material fact.

### 2. *Element 2: Casual Employment*

The second element of the WCA asks whether the employment was casual. "[E]mployment is casual in character where it is occasional, irregular, or incidental as distinguished from regular and continuous." *Brookhaven*, 912 A.2d at 293 (internal quotation marks and citation omitted). In other words, work is casual where it "comes about by chance, fortuitously, and for no fixed duration of time." *Id.* (quoting *Blake v. Wilson*, 112 A. 126, 129 (Pa. 1920)). The District Court found that Eisenberry was employed casually based on several factual findings: (1) Eisenberry's employment was occasional, without a set schedule; (2) Eisenberry's work served the limited purpose of caring for the donkeys; and (3) Eisenberry's compensation was not fixed. Of these factual findings, only the first is relevant in determining whether Eisenberry worked with regularity. That Eisenberry's tasks were limited and his compensation imprecise has no bearing on the frequency with which he worked.

As to the regularity of his employment, we conclude that a genuine dispute of material fact exists that precludes a finding that Eisenberry worked occasionally. In support of this determination, we look to the "sham affidavit" doctrine. This doctrine states that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)

15

(citation omitted). "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). As a remedy, a district court is permitted to disregard the affidavit, *id.*, unless there is independent evidence to bolster the contradictory testimony, *id.* at 254.

In the underlying tort action that Eisenberry brought against Shaw for damages, Shaw was questioned about the regularity of Eisenberry's work:

> Q: Can you tell me how much time that year he would have fed and watered the donkeys?
>
> A: 10 to 12 times.
>
> . . . .
>
> Q: Would he – I understand from some testimony they [sic] has given that he would have worked Saturdays and Sundays in feeding and watering the donkeys. Does that sound correct to you?
>
> A: No.
>
> Q: No? Okay.
>
> A: Sundays is a normal day to clean the barn. You know, so it's possible he could be there a couple of Sundays a year, but . . . .
>
> Q: Okay. So your recollection is that he was only there on a few Sundays, a couple of Sundays a year?
>
> A: It's possible that he could have been there, yes.

(App. 18.)

16

In that same action, Eisenberry was asked a similar line of questioning:

> Q: And would you work for Tim three days per week?
>
> A: Usually two days a week doing the barn, that's Saturday and Sunday and the rest of the time he'd call me up if he needed me for anything.
>
> Q: So what was your primary job with Tim, what was it that you did mostly?
>
> A: Clean the barn.
>
> Q: And that was usually on a Saturday and Sunday?
>
> A: Yup.
>
> . . . .
>
> Q: You heard him, Tim, testify that you were there, approximately, maybe, 10, 12 times a year?
>
> A: I was there a lot more than that. I was there every Sunday.
>
> Q: Just helping out at the barn?
>
> A: Yeah, cleaning the barn.

(App. 250, 257.) Not only did Eisenberry establish in the prior litigation that he worked for Shaw at least two days a week, in addition to any days that Shaw requested, but Eisenberry directly refuted Shaw's recollection that he (Eisenberry) worked only a handful of times during the year.

Now, in the present case, just five days before Shaw and Eisenberry filed a motion for summary judgment, Eisenberry signed an affidavit that was attached to the motion. In that affidavit, Eisenberry contradicted his prior testimony in the underlying case and sought to align his testimony with Shaw's. As to the frequency with which he worked,

17

Eisenberry stated, "Tim would call me when he needed help usually ten (10) to twelve (12) times per year." (App. 91.) Eisenberry made no mention of having worked at least every Saturday and Sunday, as he previously had testified in the underlying case.[9]

Although Shaw testified in the prior action that Eisenberry worked on an irregular and infrequent basis, Eisenberry flatly disagreed. Perhaps recognizing that his testimony would possibly put him within the purview of the employee liability exclusion, Eisenberry reversed course, just days before moving for summary judgment, and sought to harmonize his testimony with Shaw's.

At oral argument, counsel for Shaw and Eisenberry was presented with, and asked to explain, Eisenberry's conflicting testimony. Despite his efforts, counsel was unable to find congruency between the two sets of statements. Counsel instructed this Court to breathe new meaning into Eisenberry's prior testimony that he worked at least two days per week on Shaw's farm. As counsel stated, Eisenberry's farming background and limited education meant that he viewed the term "work" as synonymous with simply visiting the animals and performing no work at all. We reject counsel's interpretation. Not only does this interpretation—that working at least two days a week cleaning a barn is a rural euphemism for spending quality time with animals—defy common sense, counsel could identify no independent evidence in the record to bolster this alternative interpretation.

---

[9] One need not look far to perceive the objective of the affidavit. Eisenberry holds a judgment based on the underlying action against Shaw. Eisenberry seeks enforcement of the judgment. Given the employee liability exclusion provision, both Shaw and Eisenberry would be well served if they testified that Eisenberry was a casual worker.

18

The District Court determined that there was no inconsistency between Eisenberry's testimony and his affidavit regarding the frequency with which he worked. But the District Court provided no justification for its determination, merely stating, without support, that "Eisenberry's description of his frequent presence at the barn and frequent assistance to Shaw does not contradict Eisenberry's sworn testimony." *Shaw*, 2011 WL 3667565, at *7 n.3. We cannot discern how the District Court reached this conclusion. To the contrary, as counsel for Shaw and Eisenberry eventually conceded at oral argument, the common sense understanding of Eisenberry's prior testimony is in direct conflict with the statement in his affidavit.

As a result, it was error for the District Court not to disregard Eisenberry's sham affidavit. There remains a genuine dispute of material fact regarding the frequency with which Eisenberry worked. The District Court's determination that Eisenberry was casually employed is unsupported on this record. *Id.* at *9-11. Shaw testified that Eisenberry worked ten to twelve times total during the year the accident occurred. Eisenberry, on the other hand, testified that he worked every Saturday and Sunday and any other time that he was needed. Remand is necessary to ascertain whether Eisenberry was casually employed, pursuant to the second element of the WCA framework.

> 3. *Element 3: Engaged in Shaw's Business*

The third factor we must look to under the WCA framework is whether Eisenberry performed work in the regular course of Shaw's business.

While the District Court did not directly address whether Eisenberry was engaged in Shaw's business for purposes of the WCA, elsewhere in its opinion the District Court

19

found that Eisenberry's task of "caring for and feeding donkeys is action arising out of the business." *Shaw*, 2011 WL 3667565, at \*4. The parties do not challenge this determination. Based on this isolated statement and an application of the conjunctive approach, Nationwide asserts that one of the two statutory criteria for exemption is lacking, requiring that we simply reverse the District Court and award summary judgment in its favor.

Given the numerous factual disputes in the record and the District Court's omission of any analysis on this element, we find it prudent not to hypothesize whether the District Court would have found that Eisenberry was engaged in Shaw's business. As with the other statutory elements, we will remand for factfinding on this third element.

## IV.   **CONCLUSION**

For the foregoing reasons, we will vacate the District Court's Order and remand for further proceedings.