

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-2007

# Jiminez v. Amer Rathskeller Inc

Precedential or Non-Precedential: Precedential

Docket No. 06-3670

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Jiminez v. Amer Rathskeller Inc" (2007). *2007 Decisions*. Paper 326.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/326

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 06-3670

GRACE JIMINEZ, as Administratrix of the Estate of
Salvador
Peter Serrano; BROOKE E. MORGAN

v.

ALL AMERICAN RATHSKELLER, INC. d/b/a The
Rathskeller Bar;
BOROUGH OF STATE COLLEGE d/b/a State College
Police Dept.;
PHYLLIS H. GENTZEL, d/b/a The Gentzel Corporation;
BLUEBIRD ENTERTAINMENT ENTERPRISE, d/b/a The
Dark
Horse; JASON ROSENGRANT; RYAN ROSENGRANT;
CURTIS ROSENGRANT;
COLIN HAUGHTON; ASSOCIATED PROPERTY
MANAGEMENT, INC.,
d/b/a Associated Realty Property Management


Grace Jiminez,
Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No.: 04-cv-1897
District Judge: The Honorable James F. McClure

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 19, 2007

Before: SLOVITER, SMITH, and GARTH, *Circuit Judges*

(Filed:   September 21, 2007 )

Louis A. Bove
Marc J. Syken
Bodell, Bove, Grace & Van Horn, P.C.
30 South 15th Street
One Penn Square West, 6th Fl., 30 S. 15th St.
Philadelphia, PA 19102
*Counsel for Appellants*

John Flounlacker, Esq.
Michele J. Thorp, Esq.
Thomas, Thomas & Hafer, LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA  17108-0999
*Counsel for Appellee Borough of State College*
       *d/b/a State College Police Department*

Joseph P. Green

2

Lee, Green & Reiter
115 East High Street
Lock Drawer 179
Bellefonte, PA 16823
*Counsel for Appellee Phyllis H. Gentzel d/b/a/ Gentzel Corp.*

Harvey Pasternack
Pasternack & associates
270 Walker Driver
Suite 101W
State College, PA 16801
*Counsel for Appellee Bluebird Entertainment Enterprise*
*d/b/a The Dark Horse*

---

## OPINION

---

SMITH, *Circuit Judge*.

Salvador Peter Serrano died in the early hours of October 26, 2003. Serrano was a student at Pennsylvania State University. Serrano was walking down an alleyway in the Borough of State College near a bar known as the Rathskeller at about 1:30 am with plaintiff Brooke Morgan, Timothy Padalino, and Alison Bresnahan. Padalino stopped in a parking lot behind the Rathskeller to urinate.

At this point, accounts of the incident diverge. The

3

Plaintiffs allege that an altercation began when an unidentified Rathskeller employee observed Padalino and violently forced him to the ground. Jason and Chris Rosengrant, security personnel employed at the Rathskeller, testified that they were informed that a fight was under way in the parking lot. They and several other Rathskeller employees confronted a group in the parking lot that included Serrano, Morgan, Padalino, and Bresnahan. The Rathskeller employees sought to restrain members of the group. Chris Rosengrant pulled Serrano to the ground.

According to the Plaintiffs, both Rosengrants were involved in throwing Serrano to the ground. They then held Serrano down and restrained him while Jason Rosengrant pressed his knee into Serrano's back. According to the Rosengrants, Jason approached to assist Chris and placed Serrano's hand behind his back.

Officer Winkelbach of the Borough of State College Police Department ("SCPD") arrived on the scene while Jason Rosengrant was on top of Serrano. Officer Winkelbach testified that Rosengrant appeared to need assistance. Winkelbach began to handcuff Serrano before realizing that he was unresponsive.

Serrano was pronounced dead on arrival at the Centre County Community Hospital. The parties do not dispute that Serrano died of asphyxia. However, the cause has been hotly contested. The Plaintiffs' expert, Dr. Michael Baden, stated that

4

the Rosengrants' weight caused Serrano's death by positional asphyxia. The Defendants' expert, Dr. Gordon Carl Handte, performed an autopsy on Serrano and testified at a related criminal trial that he died from asphyxia by aspiration of vomitus. Dr. Handte concluded that the death was accidental and noted that substantial alcohol intoxication was a contributing factor.

The Plaintiffs Grace Jiminez, administratrix of Serrano's estate, and Morgan, Serrano's fiancee at the time of his death, filed complaints in United States District Court for the Middle District of Pennsylvania on August 25, 2004, which they amended twice. Morgan's complaint was based on injuries she allegedly suffered during the encounter. On September 27, 2005, the District Court granted a motion to dismiss by Bluebird Entertainment Enterprise, d/b/a The Dark Horse. On May 2, 2006, the District Court granted the Plaintiffs' unopposed motion for settlement and dismissed all claims against Phyllis H. Gentzel and Associated Property Management.

On June 2, 2006, the District Court granted summary judgment in favor of the Borough of State College ("State College") and the SCPD on all claims against them. On July 21, 2006, the District Court approved the Plaintiffs' unopposed motion for settlement with the remaining defendants and dismissed all claims against them. The Plaintiffs timely appealed.

5

The District Court had jurisdiction over this case pursuant to federal question jurisdiction, 28 U.S.C. § 1331, as the Plaintiffs advance claims under 42 U.S.C. § 1983. This Court has appellate jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment de novo, applying the same standard that the District Court should have applied. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

The Plaintiffs advance claims under theories of municipal liability, pursuant to *Monell v. New York City Department of Social. Services.*, 436 U.S. 658, 694 (1978), and of state-created danger liability.

## I.

Under *Monell*, a municipality cannot be subjected to liability solely because injuries were inflicted by its agents or employees. *See id.* Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation" to ground municipal liability. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). We have previously observed that "[t]here are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the

6

employee works, thereby rendering the entity liable under § 1983:"

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks and citations omitted).

We have also observed that a government policy or custom can be established in two ways. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). The Plaintiffs may establish a government policy by showing that a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issued an official statement of policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). The Plaintiffs may establish that a course of

7

conduct constitutes a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" that they operate as law. *Monell*, 436 U.S. at 690. In either instance, the Plaintiffs have the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom. *Andrews*, 895 F.2d at 1480. We have also held that, at a minimum, the government must act with deliberate indifference to the purported constitutional deprivation in order to ground liability. *San Filippo v. Bongiovanni*, 30 F.3d 424, 445 (3d Cir. 1994).

The Plaintiffs' second amended complaint alleges that the "SCPD engaged in a custom, practice, or policy of directing employees of various liquor licensees in the Borough of State College, including the Rathskeller, to detain and/or restrain persons suspected by the liquor licensee to have violated the law until such time as the SCPD could respond to the scene." The Plaintiffs allege a custom of essentially permitting the liquor licensee employees to act as an "auxiliary police-force" by handcuffing any person restrained by a liquor licensee security employee while taking no action against any security employee involved in the altercation. The complaint argues that this conduct was taken in accordance with official SCPD policy or was so well settled as to have the same practical effect. The record documents a series of incidents involving liquor licensee personnel that the Plaintiffs allege demonstrate this custom.

With regard to the Plaintiffs' *Monell* claim, the District

8

Court found that "[t]here is no competent evidence that indicates the SCPD directed liquor licensee employees to detain or restrain individuals until the police arrived to effect an arrest," and that "no reasonable jury could find from the evidence that there was a custom of delegation [to the private security personnel]."

The owner of the Rathskeller, Duke Gastiger, testified in a July 12, 2005 deposition that his employees restrained individuals for defensive purposes only, and specifically denied that they took actions to prevent persons from leaving the area "so that the police could determine whether any laws ha[d] been broken." Gastiger was responsible for setting this policy of defensive restraint and communicated it orally to his staff. Gastiger testified that the SCPD has arrested some, but not all, of the persons detained by Rathskeller employees. The Plaintiffs produced evidence of a series of incidents, each of which involved the person restrained by the liquor licensee employee being handcuffed and removed from the scene by the SCPD. Gastiger stated that he did not consult with anyone at the SCPD regarding this detention policy and that no official from the SCPD offered any training or direction to his employees.

Jason Rosengrant testified that he was only permitted to restrain individuals to prevent them from causing bodily harm, and never for the purpose of detaining someone until the police arrived. He also testified that the SCPD has never offered him any instructions or training.

9

The police officers deposed, including Chief of the SCPD Thomas King, denied that there was a policy or custom of encouraging or permitting security personnel to detain individuals until the police could arrive. The deposition testimony uniformly demonstrated that there was no written policy and that no member of the SCPD has ever given any instructions to Rathskeller employees. The sole exception was that one Sergeant instructed Rathskeller employees to confiscate false identification, but not to detain those carrying it. Several SCPD officers testified that, if private security personnel inquired about detention procedures, their policy was to refer the inquiries to the employer's private counsel or to the district attorney.

The sole piece of evidence at odds with the above testimony is an affidavit submitted by Duke Gastiger on April 20, 2006. The affidavit stated that "members of the Rathskeller staff had been asked on several occasions by the Borough Police Department to hold people until the police got there," and that, "[t]he police were aware we, on occasion, restrained intoxicated patrons until [the police] arrived." The affidavit also stated that "there was an occasion where Rathskeller staff were asked by the Borough Police to assist in apprehending and restraining individuals who were not on the Rathskeller's property."

The District Court found that Gastiger's affidavit was not competent evidence because it contradicted his prior deposition testimony. The Federal Rules of Civil Procedure do not

10

prescribe how courts should address contradictory subsequent affidavits. However, we have held that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)). This principle of summary judgment practice is often referred to as the "sham affidavit doctrine." Although District Courts do not always refer to the sham affidavit doctrine by name, its roots in the federal courts can be traced at least as far back as the Second Circuit's decision in *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 577-78 (2d Cir. 1969). Nevertheless, the Plaintiffs assert that "[t]he sham affidavit doctrine utilized by the Lower Court to discount the bar owner's affidavit was plainly in error."

The sham affidavit doctrine has created some disagreements among federal and state courts. The principal reason for these differences is that the Federal Rules do not address the handling of contradictory affidavits in summary judgment proceedings. Rule 56 governs the limited circumstances under which summary judgment is appropriate.[1]

---

[1]Rule 56 provides that the "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

11

The plain language of Rule 56 permits consideration of affidavits in summary judgement proceedings. FED. R. CIV. P. 56(e). Indeed, the original version of Rule 56 empowered courts to direct the appearance of affiant for examination, providing the court with an opportunity to question the affiant about contradictory testimony or affidavits. *See* Collin J. Cox, Note, *Reconsidering the Sham Affidavit Doctrine*, 50 DUKE L.J. 261, 266 (2000). However, the current Rule clearly contemplates that district courts will scrutinize affidavits, as it provides that, "[s]hould it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order" a variety of sanctions against the offending party. FED. R. CIV. P. 56(g). Nevertheless, as the Rule does not prescribe how the court should regard the evidentiary value of contradictory affidavits, the sham affidavit doctrine has grown from a long line of court decisions.

The signal case remains *Perma Research*, in which the Second Circuit held that a contradictory affidavit failed to raise a genuine issue of material fact. Perma Research's president, Frank Perrino, had testified extensively in depositions that he could not recall any instance in which the adverse party's employees had behaved fraudulently. 410 F.2d at 577-78. However, Perrino submitted an affidavit during summary

material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

12

judgment proceedings stating that these same employees "never had any intention" of performing their contract with Perma Research. *Id*. at 577. The Second Circuit observed that, "[i]f there is any dispute as to the material facts, it is only because of inconsistent statements made by Perrino the deponent and Perrino the affiant," and that, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id*. at 577-78.

Since *Perma Research*, every federal court of appeals has adopted some form of the sham affidavit doctrine. *See Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992); *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 706 (3d Cir. 1988); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *Reid v. Sears Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Albertson v. T.J. Stevenson Co.*, 749 F.2d 223, 228 (5th Cir. 1984); *Van T. Junkins & Assocs. v. U.S. Indus. Inc*., 736 F.2d 656, 657- 59 (11th Cir. 1984); *Camfield Tires, Inc. v. Michelin Tire Corp*., 719 F.2d 1361, 1364-65 (8th Cir. 1983); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975).

13

Although several state courts[2] and a handful of commentators[3] have criticized the sham affidavit doctrine, we do not doubt its continued vitality and importance. The Supreme Court in *Anderson v. Liberty Lobby* laid down the axiom of summary judgment practice that, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." 477 U.S. 242, 252 (1986). Some state courts have nevertheless likened the sham affidavit doctrine to a determination of credibility or a weighing of the evidence, both of which are impermissible at the summary judgment stage. *See, e.g.*, *Webster v. Sill*, 675 P.2d 1170, 1173 (Utah 1983). The *Liberty Lobby* Court recognized this distinction, noting that "it is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249. It is use of the term "genuine issue,"

---

[2] *See, e.g.*, *Polski v. Wilson*, 497 N.W.2d 794, 797 (Wis. Ct. App. 1993); *Webster v. Sill*, 675 P.2d 1170, 1173 (Utah 1983).

[3] *See, e.g.*, Michael Holley, *Making Credibility Determinations at Summary Judgment: How Judges Broaden Their Discretion While "Playing by the Rules,"* 20 Whittier L. Rev. 865, 887-904 (1999) (arguing that the sham affidavit doctrine empowers District Courts to make credibility determinations and exercise "forbidden discretion").

14

rather than any issue of fact, that implicitly demonstrates the necessity of the sham affidavit doctrine as a means of sorting the wheat from the chaff. In explaining its use of the term "genuine issue" of fact, the *Liberty Lobby* Court buttressed the trial judge's role in sorting the genuine from the fallacious: "There is no requirement that the trial judge make findings of fact. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

It is this determination that permits trial judges to disregard contradictory affidavits. A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. *See id.* at 252. *Liberty Lobby* specifically recognizes the trial judge's power to grant summary judgment on disputed records. *See id.* at 251. Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

15

The main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits. The Second Circuit noted in *Perma Research* that "[t]he deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination." 410 F.2d at 578; *see also Darnell*, 16 F.3d at 176 ("Inherently depositions carry an increased level of reliability. Depositions are adversarial in nature and provide the opportunity for direct and cross-examination."). Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995). ("We have been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit. Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants and a comparison of the diction of Russell's deposition with that of the affidavit makes clear that his affidavit is no exception." (internal citations omitted)).

Some federal courts have adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent affidavit contradicts prior deposition testimony, it should be disregarded. *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292-93 (7th Cir. 1996) ("The concern in litigation . . . is that a party will first admit no knowledge of a fact but will later come up with a specific recollection that would override the earlier admission."); *Adams v. Greenwood*, 10 F.3d 568, 572

16

(8th Cir. 1993) (holding that "an affidavit denying what is established by one's own evidence . . . does not preclude summary judgment"); *Jones v. General Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991) (holding that "it is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition").

However, this Court and other courts of appeals have adopted a more flexible approach. *See Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004), *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991), *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 705-706 (3d Cir. 1998); *see also Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991). We observed in *Baer* that not all contradictory affidavits are necessarily shams. 392 F.3d at 625. Instead, we stated that, "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." *Id.* Such corroborating evidence may establish that the affiant was "understandably" mistaken, confused, or not in possession of all the facts during the previous deposition. *Id.* We have also held that an affiant has the opportunity to offer a "satisfactory explanation" for the conflict between the prior deposition and the affidavit. *Hackman*, 932 F.2d at 241. When a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the

17

subsequent affidavit and the alleged factual issue in dispute as a "sham," therefore not creating an impediment to a grant of summary judgment based on the deposition. *See id.*

The affidavit in question was offered by Duke Gastiger, the owner of the Rathskeller and a co-defendant with the SCPD. The Plaintiffs deposed Gastiger, eliciting clear testimony that the Rathskeller's restraint policy was in no way related to police operations. When asked during his deposition whether the police ever told him not to have a policy of restraint, Gastiger responded that he "never had any conversation with the police personally about restraint." The SCPD introduced this deposition as evidence. Gastiger's subsequently filed affidavit stated that unidentified SCPD officers asked Rathskeller employees to detain individuals until they arrived. Gastiger's affidavit also claimed that, in one instance, Rathskeller employees were asked to detain an individual not on Rathskeller property. The District Court allowed that this affidavit was not in direct contradiction to the earlier deposition–the bar's policy could have been in existence at the time the SCPD made these requests–but that Gastiger's affidavit was entirely unsupported by the record and directly contrary to the testimony of every SCPD officer deposed and that of Chris and Jason Rosengrant. Moreover, since the Plaintiffs had ample time to further investigate Gastiger's eleventh-hour revelations,[4] the fact that

---

[4] Gastiger's affidavit, dated April 20, 2006, was submitted as an exhibit to Plaintiffs' brief in opposition to the

18

the Plaintiffs–and more importantly, *Gastiger*–failed to identify the specific Rathskeller employees and Borough police officers who had these alleged conversations speaks volumes about the veracity of Gastiger's affidavit. The District Court also noted that Gastiger's interests were directly adverse to those of the SCPD for purposes of the SCPD's motion for summary judgment, as resolution in favor of the SCPD would only expose the Rathskeller to greater potential liability. The District Court observed that Gastiger had offered no explanation for the conflict.[5]

No reasonable factfinder could conclude on this record that an SCPD policymaker had created a policy or acquiesced to

motion for summary judgment on April 28, 2006. The district court did not file its order until June 2 and its final judgment until July 21, 2006.

[5] Even if the affidavit were not deemed a sham, no reasonable factfinder could have concluded on the basis of the affidavit that anyone at the SCPD with policymaking authority had annunciated a policy or acquiesced to a custom of encouraging liquor licensee personnel to detain individuals until the police could arrive. *See McMillian v. Monroe County, Ala.*, 520 U.S. 781, 785 (1997) ("A court's task is to identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." (internal quotation marks omitted)).

19

a custom of delegating law enforcement responsibilities to liquor licensee personnel.  Therefore, the Plaintiffs' attempt to claim municipal liability under *Monell* was properly dismissed on summary judgment.

## II.

The Plaintiffs also claim that the Borough of State College is liable under a theory of state-created danger. *DeShaney v. Winnebago County Dep't. of Soc. Srvcs.*, 489 U.S. 189, 196 (1989).

There is no affirmative right to governmental aid or protection under the Due Process Clause of the Fourteenth Amendment.  *See id.*  There are, however, two exceptions to this rule: the "special relationship" exception and the "state-created danger" exception.  The state-created danger exception owes its contemporary origins to the *DeShaney* Court's statement that "while the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  *Id.* at 201.

This Court considered the necessary elements of a state-created danger claim in *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006).  The *Bright* Court held that a plaintiff must establish four elements to make out a claim of state-created danger liability:

20

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 281 (internal citations and quotes omitted).

The Plaintiffs state that they "adopt" Judge Nygaard's dissenting opinion in *Bright* that no affirmative act is required to ground state-created danger liability. In the alternative to this argument, which implicitly urges us to ignore our own precedent, the Plaintiffs contend that the SCPD's "look the other way" practice constituted an affirmative act sufficient to satisfy the state-created danger test. As discussed above, the Plaintiffs have not produced any evidence on which a

21

reasonable factfinder could conclude that an SCPD policymaker announced a policy or deliberately acquiesced to a custom of delegating law enforcement power to liquor licensee personnel. The Plaintiffs have presented evidence of a series of events in which SCPD officers, upon arriving at the scene of a confrontation between individuals and liquor licensee personnel, handcuffed the individuals while taking no direct action against the bar employees. Even if this course of conduct could be taken to establish an affirmative act, we are skeptical that it could satisfy either the causation or mens rea elements of the state-created danger test. *See id.* at 281 (holding that "the harm ultimately caused was foreseeable and fairly direct," and that "a state actor acted with a degree of culpability that shocks the conscience").

The District Court properly dismissed the Plaintiffs' state-created danger claims on summary judgment. We will affirm the District Court's judgment.