**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2649
_____

AAKASH DALAL,
Appellant

v.

JOHN L. MOLINELLI, JOHN HIGGINS, MARTIN DELANEY, JAMES COSTELLO,
L. JUDSON WELLE, COREY COLEMAN, JAMES SPENCE, TARA JERUSSI,
AJIT DAVID, COUNTY OF BERGEN, DET. ROBERT ANZILOTTI,
MICHAEL SAUDINO, LILIANA DEAVILA-SILEBI

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2:20-cv-01434)
District Judge: Honorable Madeline C. Arleo

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 15, 2025

Before: KRAUSE, PHIPPS, and ROTH, *Circuit Judges*

(Opinion filed: March 2, 2026)
_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Aakash Dalal filed a complaint in the District of New Jersey alleging that federal and state defendants (Appellees or the Defendants) conspired to manufacture false criminal charges against him to prevent his release on bail pending trial on a separate indictment arising out of attacks on synagogues and a Jewish community center. We will affirm the judgment of the District Court granting the Defendants' motions for summary judgment.

I.

The genesis of this civil suit lies in a heinous crime spree that rocked the Jewish communities of Bergen County, New Jersey, more than a decade ago. *See generally State v. Dalal*, 252 A.3d 204, 207-14 (N.J. Super. Ct. App. Div. 2021), *certif. denied*, 250 N.J. 500 (2022). Between December 2011 and January 2012, five North Jersey synagogues and a JCC were targeted with anti-Semitic acts of vandalism. Some were defaced with swastikas and bigoted slogans; others were firebombed, though fortunately sustained limited damage. The Bergen County Prosecutor's Office (BCPO) formed a hate crimes task force with the FBI, and investigators quickly zeroed-in on 19-year-old Anthony Graziano as their prime suspect. A search of Graziano's home turned up instructions and materials used in the assembly of Molotov cocktails, the same incendiary devices deployed in the arsons. Graziano confessed to police shortly after his arrest. Although he did not directly implicate anyone else, a forensic analysis of Graziano's computer revealed that he had discussed the attacks online with someone going by

2

"QuantumWorm," who encouraged him and advised him to search the web for bomb-making directions.

The day after Graziano's arrest, Dalal, a 19-year-old Rutgers University sophomore, called a police tip line to report that he knew Graziano but did not share his views. An interview followed at the FBI's Newark field office. Further investigation resulted in Dalal's arrest on March 2, 2012. He, too, waived his *Miranda* rights and gave a statement in which he acknowledged that he was "QuantumWorm." He also admitted that he was present when Graziano spraypainted two synagogues, and that he was aware of the latter's plans to firebomb other houses of worship, but he denied partaking in any destructive act. The BCPO charged both men with conspiracy, arson, and related crimes; a grand jury issued a 30-count indictment in March 2013.

The Superior Court of New Jersey remanded Dalal to the Bergen County Jail the same day as his arrest. He could not post the $2.5 million cash bail, and the court denied his motion for a reduction, but his emergency appeals eventually found purchase with the Appellate Division, which reduced the amount to $1 million on May 22, 2012. A month later, Dalal's attorney notified the trial court that his client had secured a bail package. The court scheduled a bail hearing for the morning of June 27.

Given the serious nature of the charges and the attendant risks to public safety, the agents and prosecutors whose efforts had led to Dalal's arrest naturally were concerned with the possibility of his release. Their misgivings grew in early May following the FBI's receipt of a handwritten letter authored by Whendel Stewart, an immigrant detainee

3

whom Immigration and Customs Enforcement officials had transferred to the Bergen County Jail back in January for disciplinary reasons. The letter, which Stewart mailed to his immigration judge in April, described his interactions with Dalal, who allegedly discussed his hatred of the government and of Jewish people with Stewart. According to Stewart, Dalal also relayed his plans to bomb federal properties in Newark, namely the FBI's field office and the building that houses the United States Immigration Court, the latter of which apparently provoked Stewart's concern for the safety of the judge overseeing his removal proceedings.

The FBI promptly notified the United States Attorney's Office in Newark, which opened a domestic terrorism file two days later, on May 10. The United States Marshals Service simultaneously commenced a protective investigation because Stewart's letter mentioned several federal assets. FBI agents then interviewed Stewart on four occasions. The interviews were not recorded electronically, but agents memorialized them in reports commonly referred to as "FBI 302s." During the first interview, on May 14, Stewart discussed Dalal's anti-government extremism, his bomb-making knowledge, and his desire to blow up Newark's federal buildings, possibly using C-4 and either a government vehicle or an explosives vest. Stewart claimed Dalal provided a list of chemicals he needed for bomb making and asked how he could obtain a contraband cellphone and firearms. Dalal also allegedly discussed wanting to kill specific individuals, including a Bergen County prosecutor.

4

On May 22, task force members learned that Dalal's bail had been reduced and communicated that fact to the Assistant United States Attorney assigned to investigate Stewart's allegations, who spoke with FBI Special Agent Corey Coleman by phone the next day. Coleman interviewed Stewart at the Bergen County Jail in the company of an ICE agent on June 1. In that interview, Stewart claimed that Dalal had asked for help obtaining a contraband cellphone because internet access would help him inflict greater damage, bragged about being able to access blueprints for any buildings, said he had received military training abroad, and revealed his plan to abscond to the Cayman Islands upon making bail. Stewart also told Coleman about his immigration issues, and the pair discussed potential benefits Stewart could receive for his formal cooperation, such as financial compensation and a reprieve from removal,[1] as well as things that were not up for consideration, like the dismissal of criminal charges to which Stewart had pled guilty.

Coleman interviewed Stewart again on June 21 at an FBI field office. Stewart told him that Dalal had taken more concrete steps to obtain a firearm and expressed an interest in killing the head of the BCPO's Major Crimes Arson Squad, Assistant Prosecutor Martin Delaney, among others. Stewart handed over two notes Dalal allegedly had written. One contained Delaney's name and title. The other included Dalal's name and an email address ("ad@unelected.org") that Stewart's sister was supposed to contact

---

[1] Coleman was not authorized to guarantee Stewart that he would be paid for cooperating, and they did not discuss a dollar amount. The FBI paid Stewart $1,000 in February 2013.

Dalal through after buying a handgun for him. Coleman shared these details with the BCPO that day. He then met with Stewart on June 25 for a third interview, at which Stewart agreed to become a confidential source for the FBI. Coleman later testified that he was aware of Stewart's extensive criminal history and gang ties prior to using him as a source, but considered him to be credible notwithstanding.

Stewart spoke with Dalal at the jail on June 25 and 26 while wearing a wire. Coleman partially transcribed the audio recordings, focusing on what he considered to be the most troubling exchanges. In one conversation, Dalal asked if Stewart could get him a particular firearm. Stewart said he did not have that specific model, but he did have a different 9mm handgun. Dalal then wondered if Stewart's cousin, who was serving in the Navy, had access to other weapons. Stewart said his cousin had an automatic rifle, but Dalal replied that he was interested in handguns. Stewart then offered to sell Dalal a gun that he already had at home for $300, payable to Stewart's sister. Dalal initially demurred given the gun's uncertain provenance. When Stewart asked Dalal whether he needed an AR-15 rifle, Dalal said he would wait to get one of those until his legal issues were over; he just needed something for self-defense. A short time later, Dalal confirmed that he would contact Stewart's sister in two or three months.

Dalal became cagey in other conversations, declining to discuss certain topics—like how to make explosives—with Stewart until they were out of prison. In one exchange, though, Stewart recalled a prior conversation in which Dalal had mentioned a scheme to get a group of government officials together by killing one of them, which

6

prompted Dalal to reference the victim's funeral. Dalal also expressed an interest in torturing or kidnapping some of the people he blamed for ruining his life, though he conceded that doing so would have little systemic effect. It is undisputed that Dalal did not express a desire to kill Delaney specifically on the recordings. Dalal also refused Stewart's $5,000 offer to act as a hitman.

Coleman met with a BCPO supervisor and a detective on the morning of June 27 and turned over Stewart's letter, the 302s from his interviews, and his draft transcriptions of the prison recordings. The materials were given to BCPO Detective James Costello, who orally applied for an arrest warrant based on new charges that Dalal had made terroristic threats and conspired to possess a firearm and to murder Delaney. The trial court granted Costello's application. Later that day, Costello applied for a warrant to search Dalal's cell.[2] The trial court granted that application as well and imposed an additional bail amount of $3 million, effectively ending Dalal's chances at pretrial release.

Numerous incriminating documents were recovered from Dalal's cell. One document, a printout of a receipt the jail had issued to Dalal, is covered in variants of his signatures, which appear alongside the words "DEAD COPS" and a chart identifying the

---

[2] The record does not include a written affidavit of probable cause in support of the arrest warrant or a recording of Costello's oral presentation. However, the parties do not dispute that, when Costello applied for the search warrant, he submitted an affidavit that was factually identical to the probable cause presentation he proffered to the court that morning.

"BCPO," "Delaney," and others as "enemies." *See* Supp. App'x 454; *see also* Supp. App'x 462 (depicting expanded "enemies" list, including specific BCPO prosecutors and detectives); 465 (identifying "BCPO" and "3 detectives" as "Necessary Targets"); 481 (listing "●Compile Dossiers" on Delaney, Costello, and others under "To Do"). "DEAD PROSECUTORS = FREEDOM" is emblazoned at the top of another. *See* Supp. App'x 480. In a third, titled "VIOLENCE AGAINST THE STATE (government) IS ALWAYS JUSTIFIED (moral) by Aakash Dalal," the author pontificates that "violence against an entity like the state is always justifiable *as self-defense*," *see* Supp. App'x 459 (emphasis added), and that "guerrilla tactics" must be adopted "to even the playing field," *see* Supp. App'x 461. Such tactics might include "swatting" or "radio detonation" of vehicles or structures using "C4"—a scheme the author dubbed "Operation Booming Bees." *See* Supp. App'x 462-64. The papers also are peppered with references to "unelected.org," the domain name written on one of the notes Stewart turned over to investigators. *See* Supp. App'x 466, 473, 476, 481.[3] Delaney's name appears again and again, more than that of any other person. *See* Supp. App'x 454, 462, 465, 474, 481, 482.[4]

---

[3] Dalal's defense attorney twice told the bail court that his client had created "Unelected.org" as a political website.

[4] Additional documents, both typed and handwritten, appear to be innocuous recollections of Dalal's interactions with detectives, possible strategies for suppressing evidence, and the outlines of a potential civil suit against the BCPO.

Federal prosecutors ultimately declined to charge Dalal. A senior inspector with the U.S. Marshals, Paul Safier, separately recommended closing his agency's protective investigation because Dalal was not considered a credible threat to federal property as of July 26, 2012. Safier reached that conclusion in his final threat assessment report after consulting with Coleman and an Assistant United States Attorney, who collectively weighed several factors, including Dalal's ongoing incarceration, his inability to access outside sources, the absence of an operational plan, and the fact that Stewart no longer had contact with him after being transferred to a different facility in Buffalo, New York, for safety reasons.[5]

On July 31, 2012, Costello testified before a Bergen County grand jury and read into the record, *inter alia*, Stewart's letter, some of the reports memorializing his interviews with federal agents, portions of the transcribed jailhouse recordings, and several of the documents recovered from Dalal's cell. Stewart was not called to testify. The FBI subsequently withdrew its request to defer Stewart's deportation to Guyana, ostensibly over concerns about his criminal record. Costello sought to delay the deportation once he learned about it from Coleman, but Stewart was removed from the United States on or about August 6, 2013. The next day, prosecutors made public Dalal's indictment for threatening and conspiring to murder Delaney and for conspiring to

---

[5] Stewart continued to offer his assistance to federal investigators in unrelated matters, though his efforts to elicit incriminating information about a murder-for-hire plot from one inmate went awry when he repeatedly failed to heed the agents' directive not to discuss the underlying capital case with the defendant, drawing one District Court's ire.

9

possess an assault firearm. Dalal filed a motion to dismiss that indictment, which the Superior Court denied.

Dalal and Graziano separately went to trial on the arson charges in the fall of 2016. A jury found each guilty on multiple counts, including first-degree terrorism, aggravated arson, criminal conspiracy, and bias intimidation. Prior to sentencing, the BCPO moved to dismiss Dalal's murder-conspiracy charges. The prosecutor assigned to that case had prepared a memorandum recommending dismissal for two principal reasons: Dalal already was facing a sentence of 30-years-to-life for the synagogue attacks, and getting Stewart back to the United States to testify would be incredibly difficult and expensive for the county. Without Stewart, proving Dalal's guilt beyond a reasonable doubt would be a challenge. The court granted the State's motion and dismissed the charges on July 26, 2017. Dalal was sentence to 35 years' imprisonment two days later.

Dalal initiated this matter in the summer of 2019 by filing a complaint in New Jersey state court, naming as defendants Bergen County, its sheriff, the judge who approved the warrant applications, and nearly a dozen state and federal investigators and prosecutors who had a role in his criminal cases. The Federal Defendants removed the case to the United States District Court for the District of New Jersey, where Dalal filed an amended complaint under 42 U.S.C. § 1983 alleging that the Defendants conspired to violate his civil rights by fabricating evidence and maliciously prosecuting him in

10

contravention of state and federal law.[6]  The gravamen of the complaint is that the Defendants "planted" Stewart at the jail to entrap Dalal into committing a federal crime, which they could then use to stymie his impending release on bail, but their plan failed when Dalal refused to go along, so they simply made up the plot to kill Delaney.

The District Court dismissed Dalal's *Bivens* claims along with the County, sheriff, and judicial defendants.[7]  The parties then conducted discovery for the better part of two years.  They exchanged thousands of pages' worth of documents, and Dalal deposed or propounded lengthy interrogatories to each of the remaining defendants.  Dalal's own deposition, though perhaps less edifying than the other examinations, would prove to be the most significant.  Whenever he was asked what pieces of evidence supported his conspiracy claims, Dalal invariably pointed to "the record" and "the documents" passed in discovery; he found it impossible to identify anything specifically at that point.  He persisted in offering vague answers when pressed to identify specific documents that he believed were fabricated, saying he would have to review all of the discovery materials again to be sure.  As for naming the fabricators, Dalal thought it was reasonable to infer that each of the Defendants was involved.  In the end, the only documents he definitively contested as fabrications were the two handwritten notes Stewart turned over to the FBI,

---

[6] In addition to Section 1983, Dalal invoked *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346; and New Jersey's statutory and common-law analogues.

[7] Dalal does not appeal these decisions.

which Dalal admittedly speculated Coleman had created because he attached them to his report.

Discovery formally closed on July 1, 2022, the day after Dalal's deposition. The State and Federal Defendants each timely filed a motion for summary judgment in September 2023. Dalal filed his consolidated response nearly five months later. He appended to that filing a "certification" in which he specifically identified, for the first time, the documents he claims were fabricated after his arrest. The list comprises many (but not all) of the papers seized from his cell. Dalal submitted that, to the best of his recollection, he did not write them, and that they appeared to be hastily crafted by the Defendants. He also asserted a new fact, to wit, that Costello and another BCPO detective threatened to hurt him if he did not confess during a post-arrest interrogation, and that they both admitted they knew Dalal did not threaten Delaney.

The District Court granted the Defendants' motions. In a lengthy, thorough opinion, the Court explained that Dalal's fabrication-of-evidence claims rested on numerous "strained inferences," mostly relating to Stewart, that were unsupported by the record. *See* Doc. 276 at 42-45. The Court similarly was unpersuaded by Dalal's cherry-picked reading of Safier's threat assessment report, highlighting its conclusion that the protective investigation should be closed because Dalal was not deemed "a credible threat to any federal asset at this time," which had no bearing on the viability of the state charges. *See id.* at 45-46 (quoting Safier's Report at 17) (District Court's emphasis). Dalal disputed the accuracy of Coleman's unofficial transcript of the jailhouse recordings

12

and dismissed it as "falsified" because it did not include exchanges that Coleman did not find troubling; the Court rejected that challenge as well after noting that the elided portions were not exculpatory. *See id.* at 46-47. Dalal also relied heavily upon the conclusory allegations in his certification that the Defendants had falsified documents, which the Court remarked "border[s] on a sham affidavit" because he did not raise them in his pleadings or disclose them through discovery or his deposition. *See id.* at 47-49 & n.30. The Court still considered those and other belated assertions but found them unavailing.

The District Court reasoned that Dalal's malicious prosecution claims failed on several grounds. Some defendants were entitled to prosecutorial immunity, while others were not personally involved in the charging decision. Dalal contended that Costello deliberately or recklessly excluded from the affidavit of probable cause certain details about Stewart—like his criminal history and gang ties, his requests for assistance with his immigration case, and his scant record as an informant—that called his reliability into question. Even though Dalal proffered no evidence that the State Defendants were aware of those issues when Costello applied for the arrest warrant, the District Court reconstructed his affidavit to include that information and found probable cause for Dalal's arrest and subsequent indictment in any event. As to Dalal's remaining claims, the Court found no evidence that the Defendants had unlawfully conspired to deprive him of a constitutional right, dooming his Section 1983 challenge and his common-law tort claims under the FTCA and New Jersey law. And, in the absence of a constitutional

13

violation, the Court concluded that all defendants were entitled to qualified immunity. Dalal appeals. He and Appellees also move to seal their respective appendices, in whole or in part, because they contain protected information.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's summary judgment ruling. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). Summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.

Dalal leaves few stones unturned in his effort to overturn the District Court's adverse judgment. We begin with his fabrication-of-evidence claim, which undergirds his other claims.

## A.

Due process forbids the government from using "falsified evidence . . . as a basis to initiate the prosecution of a defendant." *Halsey v. Pfeiffer*, 750 F.3d 273, 289 (3d Cir. 2014). To recover damages related to such tainted prosecutions following an acquittal, an aggrieved plaintiff must demonstrate "a reasonable likelihood that, absent that fabricated evidence, [he] would not have been criminally charged." *See Black v.*

14

*Montgomery Cnty.*, 835 F.3d 358, 371 (3d Cir. 2016). We have cautioned that "incorrect or simply disputed [testimony] should not be treated as fabricated merely because it turns out to have been wrong"; rather, there must be "persuasive evidence" that the proponents of the testimony knew it was wrong but offered it "in bad faith" nonetheless. *See Halsey*, 750 F.3d at 295. For that reason, we posited that police officers accused of having fabricated evidence would likely be able to obtain summary judgment in all but the most "unusual" civil suits. *See id.* We reiterate that fabrication claims face a "notable bar" and "should not survive summary judgment unless [the plaintiff] can demonstrate that the fabricated evidence 'was so significant that it could have affected the outcome of the criminal case.'" *See Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295). Dalal cannot overcome these hurdles.

The Federal Appellees contend that Dalal's eleventh-hour assertions that certain documents seized from his cell were fabricated and that two BCPO detectives admitted he did not threaten Delaney should be disregarded because the "certification" in which he first raised them is a sham. We agree. "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Courts should disregard sham affidavits because they "cannot raise a genuine issue of fact" and thus "no reasonable jury could rely on [them] to find for" a nonmoving party. *Id.* In our circuit, "an otherwise questionable affidavit" may be considered if it can be "bolster[ed]" by "independent

15

evidence in the record," or if the affiant provides a "satisfactory explanation" for the inconsistencies between their prior deposition and subsequent statement. *See id.* at 254 (quoting *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004)); *see also Daubert v. NRA Grp., LLC*, 861 F.3d 382, 392 (3d Cir. 2017).

Dalal's certification, viewed in light of his deposition, bears the hallmarks of a sworn statement carefully crafted to defeat summary judgment by way of sandbagging the defense. Prior to his certification, Dalal never so much as hinted that anyone involved in the investigation had told him the charges concerning Delaney were false. Nor did he identify any of the documents taken from his cell as fabrications when Appellees asked him for examples as late as June 2022. He claimed then that the record was too voluminous and that he needed to review thousands of pages of documents again before providing an answer. None was forthcoming in the months that followed.

There are a few obvious problems with Dalal's wait-and-see tactics. With respect to the supposed admission, Dalal certainly would have known what he was told during an interrogation in 2012. He blames Appellees for failing to question him about it a decade later, but the onus was on him to put Appellees on notice of the allegation by including it in his pleadings. He likewise was aware of the tranche of seized documents at issue, totaling just 29 pages, at least half-a-decade before submitting his certification because he moved to suppress them ahead of his arson trial; indeed, he claimed at the time that they were his "personal papers and writings." *See* Supp. App'x 659. Appellees disclosed the documents again in connection with this litigation, and several were mentioned in the

16

transcript of the grand jury proceedings, a copy of which Dalal also had received by June 2022. And yet, Dalal did not say anything about them in his pleadings, at his deposition, or at any time between the formal close of discovery and the filing of his opposition to Appellees' summary judgment motions 18 months later. It strains credulity to suggest that he could not identify those items with particularity given their centrality to his legal battles then and now. Dalal has not proffered a satisfactory explanation for his failure to challenge these documents or to invoke the revelatory interrogation sooner, and the record does not independently support the contested portions of his affidavit, so we will disregard his belated allegations.

Dalal dismisses the relevance of the documentary evidence to his present claims because "it was not used to bring new charges." *See* C.A. Doc. 54 at 1 (emphasis in original). Be that as it may, as the documents' authenticity is not genuinely in dispute, we may consider them among the totality of the evidence when assessing whether his fabrication claim has legs. Dalal maintains that he never said anything incriminating to Stewart about harming Delaney or blowing up federal buildings, and that he never gave Stewart any handwritten notes. But the documents seized from Dalal's jail cell suggest that he was preoccupied with those subjects while imprisoned. Dalal believed that "dead prosecutors" were the price of his "freedom." He named the BCPO as a "necessary target," and he wrote about "compiling dossiers" on several people, including Delaney, whose name features prominently on a few "enemies" lists Dalal had made. Dalal also composed a rough plan for attacking federal buildings with car bombs, complete with

17

sketches of makeshift explosive devices and an alliterative code name for the scheme: "Operation Booming Bees." It is impossible to square this damning evidence with Dalal's self-serving, general averments that everything Stewart said or gave to the FBI, or that the FBI turned over to Costello, was fictitious.

Not only do the documents corroborate the crux of Stewart's letter and follow-up statements to investigators, they also belie Dalal's claim that he did not author the handwritten notes containing Delaney's name and an email address that Stewart said was to be used for illicit correspondence after Dalal made bail. To the lay observer, the penmanship on the papers Dalal disavows is indistinguishable from the handwriting on the numerous documents taken from his cell whose authenticity he has never disputed, like those containing references to Dalal's website, "unelected.org," which is part of the email address written on one of the notes Stewart gave to investigators. Dalal could have attempted to create a genuine dispute of material fact by submitting the notes and other exemplars to an expert for forensic examination, but he did not. Consequently, the record is bereft of evidentiary support for Dalal's bald assertions that the notes were fabricated.

Moreover, we agree with the District Court that Dalal's other attempts to identify factual disputes fall short. Dalal made much hay of the timing of certain events in hopes of casting aspersions on Stewart's veracity, but each claim withers under the slightest scrutiny. For instance, he contended that Appellees "planted" Stewart at the Bergen County Jail with instructions to entrap him. But Stewart was transferred to the jail for disciplinary reasons in January 2012, over a month before Dalal's arrest and weeks

18

before he even became a suspect in the arson case. Dalal identifies no evidence that Stewart had worked with the FBI in the past, and it is not reasonable to infer that he had done so based upon his subsequent assistance to federal authorities in New York. Nor is it reasonable to infer that Stewart's deportation was part of some scheme to deprive the grand jury of his testimony. Costello averred that he tried unsuccessfully to delay Stewart's removal, and he testified to the grand jury while Stewart was still in the United States, so the grand jurors could have heard directly from Stewart if they had wanted to.

The record also shows that the FBI and the U.S. Marshals started investigating Stewart's letter in earnest immediately upon receiving it from the Immigration Court, several weeks before Dalal's bail was reduced, when his release on $2.5 million bail was improbable. That fact undermines Dalal's theory that Appellees concocted the letter out of fear that his release was imminent. As for Safier's threat assessment report, it in no way undermines the validity of the state charges; the report plainly concludes that Dalal was not a risk to federal assets while incarcerated because he lacked the means to operationalize his plans while indefinitely confined to a jail cell.

Whatever incentives Stewart may have had to lie to the FBI to delay his inevitable deportation, Appellees had cause to vouch for his credibility because his prior statements were consistent with Dalal's own words, captured on the jailhouse recordings. Dalal clearly asked Stewart to help him get a firearm, and he confirmed that he would reach out to Stewart's sister after Stewart told him to pay her $300 for a gun. Dalal used the words "kidnap" and "torture" to describe what he wanted to do to the people he felt had ruined

19

his life by putting him in jail. And Dalal inadvertently revealed that he and Stewart previously had discussed a scheme, however aspirational, to "take out" a government official so that the victim's confreres would be forced to gather as a group at the victim's funeral, where they presumably would be targeted for reprisals as well.

Dalal chides the District Court for ignoring "clearly exculpatory" portions of the recording and for crediting Coleman's rationale for excluding them from the draft transcript he prepared. *See* C.A. Doc. 20 at 27. We have reviewed the elided portions identified by Dalal and we agree with the District Court that they do not exculpate him from the charges he ultimately faced. For instance, it is not reasonable to infer that Dalal had never discussed his desire to kill Delaney with Stewart in the months they were confined together simply because he did not do so during the two-day period in which he was recorded. Dalal also highlights one exchange he believes unambiguously shows that he was interested in obtaining a weapon for "self-defense," not violence. But he was not entitled to possess a weapon for any purpose while under indictment. *See* 18 U.S.C. § 922(n). Nor was he allowed to conspire to buy one via a straw purchaser. *See id.* § 932(b). And we would be remiss not to point out that one of the documents recovered from Dalal's cell, a manifesto of sorts, expressly contemplates violence against the state as a form of self-defense, so his use of that phrase is hardly exculpatory in the full context of his worldview.

At bottom, Dalal has not presented "persuasive evidence" that Stewart's statements to authorities were false or that they were passed along to the BCPO or

20

presented to the state court in bad faith. *See Halsey*, 750 F.3d at 295. The same is true of Coleman's draft transcript of the jailhouse recording. No reasonable juror could conclude that Appellees acted recklessly, let alone deliberately or for nefarious reasons, in pursuing criminal charges under the circumstances. For these reasons, in addition to those provided by the District Court, Appellees are entitled to summary judgment on Dalal's fabrication claims.

### B.

Dalal's malicious-prosecution claims fare little better. To prevail on such a claim, a plaintiff must show that the defendants initiated a criminal proceeding without probable cause; that they did so with malice "or for a purpose other than bringing the plaintiff to justice"; that the proceeding ended in the plaintiff's favor; and that the plaintiff "suffered a deprivation of liberty consistent with the concept of seizure." *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007). Courts must assess probable cause "charge by charge." *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024). In undertaking that review, we are mindful that probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Appellees easily clear it on this record.

Dalal initially was charged with three offenses: (1) conspiracy to commit murder (N.J. STAT. ANN. §§ 2C:5-2, 2C:11-3); (2) conspiracy to possess a firearm with a purpose to use it unlawfully against another person (*id.* §§ 2C:5-2, 2C:39-4A); and (3) making terroristic threats, *i.e.*, threatening to kill another person (*id.* § 2C:12-3B). A person is guilty of criminal conspiracy under New Jersey law if he, *inter alia*, agrees with one or

21

more people to commit a criminal act, and if at least one conspirator performs an overt act in furtherance of the agreement. *See* MODEL JURY CHARGE (CRIMINAL), § 2C:5-2, "Conspiracy" (revised Apr. 12, 2010). He is also guilty of making terroristic threats if he threatens to kill another person with the purpose of putting the victim in imminent fear of death and under circumstances that reasonably cause the victim to believe the threat was likely to be carried out. *See id.* § 2C:5-2, "Terroristic Threats (Threats to Kill)" (revised June 14, 2004). Relevant to Dalal's charges, murder means purposefully or knowingly causing the death of another. *See id.* § 2C:11-3a, "Murder" (revised June 14, 2004). The elements of the predicate firearm offense are self-evident. *See id.* § 2C:39-4(a), "Possession of a Firearm with a Purpose to Use it Unlawfully Against the Person or Property of Another" (revised Oct. 22, 2018).

The BCPO had not yet obtained the incriminating documents from Dalal's cell when Costello applied for an arrest warrant, so we limit our review to the information he submitted to the Superior Court, which he drew from Stewart's letter, the handwritten notes Stewart gave to Coleman, Coleman's reports from his interviews with Stewart, and the partial transcript of Stewart's jailhouse conversations with Dalal. As Dalal has failed to establish that any of the foregoing evidence was fabricated, the District Court properly declined to redact any details derived from that evidence in its probable cause assessment. The Court also was right to recreate Costello's affidavit to add or clarify details that any court would wish to know when faced with a warrant application predicated upon the cooperation of a jailhouse informant like Stewart. Dalal quibbles

22

with various aspects of the District Court's recreated affidavit, but we are unpersuaded by his objections. Notwithstanding Stewart's liabilities, we have already determined that Appellees had good cause to vouch for his credibility because the recordings corroborate significant aspects of his letter and prior statements. With all that in mind, we are satisfied that Dalal's charges were supported by probable cause.

According to Costello's affidavit, Stewart told the FBI that Dalal expressed his intent to kill Delaney, the lead prosecutor in the arson case, after getting out of jail; Dalal then "planned to flee to the Caymen Islands," where he believed he could avoid extradition. *See* Supp. App'x 450. The pair also discussed how Dalal could obtain a firearm. During their conversation, Dalal allegedly handed Stewart handwritten notes, one containing Dalal's email address, the other identifying Delaney by name and title. Dalal cannot reasonably contest Costello's averment that he was recorded "discuss[ing] . . . his efforts to obtain a handgun" with Stewart. *See* Supp. App'x 451. Taking these factual allegations together, there was a "fair probability" that Dalal had committed the crimes with which he was charged. *See Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). That is all the law requires.[8] Because the absence of probable cause is an essential element of any malicious

---

[8] The indictment BCPO prosecutors subsequently obtained likewise was adequately supported, as Costello presented even more evidence to the grand jury, including several documents seized from Dalal's cell and more fulsome excerpts from Stewart's letter, Coleman's transcript, and the FBI 302s.

23

prosecution charge, its presence on this record is fatal to Dalal's claims under state and federal law.

## C.

As goes Dalal's constitutional claims, so goes his ability to prove a grand conspiracy to violate his rights. "To prevail on a conspiracy claim under [Section] 1983," Dalal must prove that Appellees "'reached an understanding' to deprive him of" some constitutional right. *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)). Dalal claimed that Appellees conspired to fabricate evidence and to maliciously prosecute him in violation of the Fourth and Fourteenth Amendments. As we have explained, Appellees are entitled to summary judgment on those substantive claims for want of evidence. Without "an actual underlying constitutional violation," Dalal's conspiracy claims necessarily fail as well. *See Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020) (citing *Jutrowski*, 904 F.3d at 295); *see also Jutrowski*, 904 F.3d at 294 n.15 (explaining that the unfavorable resolution of plaintiff's civil conspiracy claims under Section 1983 "also dictates [the] disposition of his state conspiracy claims" under New Jersey law).[9]

We grant Dalal's and Appellees' motions to seal their appendices, and we will affirm the judgment of the District Court.

---

[9] Dalal's failure to make out a constitutional violation also entitles Appellees to qualified immunity. *See Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002).

24